Keating, J.
Richard Damon has been convicted of carnal abuse of a child, assault second degree, burglary third degree, and two counts of burglary in the second degree, as contained in two separate indictments.
Two separate incidents, one just before midnight on Wednesday, October 13, 1965, and the second on the morning of Saturday, October 16, 1965, are involved. Both occurred in the Village of Depew near Buffalo. On the first date a man broke into a home and there molested a nine-year-old child while her father was taking her mother to work. In the second incident, which took place in the same neighborhood, a man attempted to get into a house where a fourteen-year-old girl was home alone. In both instances the man was seen to leave the scene hastily in a three or four-year-old, white Cadillac convertible.
Lieutenant John Maccarone of the Village of Depew Police Department was placed in charge of the investigation. He was a neighbor of the family involved in the second incident and, in fact, when the intruder sought to gain entrance to the home, the girl started to telephone Mr. Maccarone’s home for assistance and, immediately after the man ran away, she spoke with Mr. Maccarone’s daughter.
*259 For a year prior to these two incidents, the defendant was employed as a bartender in a combination bar and restaurant, which was approximately four or five minutes driving time from the neighborhood where the crimes took place. Damon was 39 years old, married, with four young children. His wife, a surgical nurse, owned a 1961 white Cadillac convertible, which the defendant drove regularly to work. His usual hours of employment ran from 11:00 a.m. to 8:30 p.m. Monday through Saturday.
Three days after the second crime, Lieutenant Maccarone arrived at the bar restaurant around noon and, after an hour’s discussion, asked Damon to accompany him to police headquarters. They drove to the station together in the defendant’s automobile. Upon arrival, Damon was kept waiting in front of the complaint counter for between 30 and 45 minutes. While he was standing in front of the complaint desk, he was observed by the two girls by means of a mirror. Later there was a formal lineup at which the two girls again picked out the defendant. The defendant was also identified by the younger girl’s father as the man he noticed in the vestibule of his house and with whom he had a brief conversation when he returned home on the night of the crime.
The defense was mistake of identity. Various witnesses were called by the defense who placed him in the bar restaurant at or about the time of the second crime. There was also testimony which would have made it impossible for defendant to have committed the first crime. Thus the entire case rested completely on the credibility of witnesses and the accuracy of their recollections.
In this context we proceed to examine the points of error raised. The first is the most substantial one. It is claimed that the summation -of the prosecutor was highly inflammatory and prejudicial, mandating a new trial. Defendant had been released from prison in 1957. At one point in the summation, reference was made to homosexual or abnormal conduct in prison. The inference which the prosecutor sought to have the jury draw was apparently that the defendant was a homosexual or deviate. No doubt this was an attempt to explain the otherwise complete lack of evidence of psychiatric illness or mental aberration.
*260 There was also a comment implying- that the police would not go after an innocent man because they are afraid of false arrest and false imprisonment suits. The prosecutor. also accused defense counsel of “ sandbagging witnesses ” and other improper conduct with witnesses. An improper reference to an alleged conversation between defense counsel and a witness occurring outside the courtroom was also made. Further, there was an allusion that the work records of one of the defendant’s witnesses were missing from his place of employment under suspicious circumstances, although there was no testimony to this effect in the trial. The terrible nature of the crimes involved was emphasized to the jury, although the defendant-conceded that the crimes had occurred. Objection was not made to many of these statements. Nevertheless, sufficient protest to preserve the point for review was recorded.
Some of the comments in context do not appear to have been as inflammatory as the above summary would indicate and, in addition, some of them might be justified as a response to arguments made by defense counsel. Still the references to the heinous nature of the crimes and to possible deviate behavior and the attacks on defense counsel as well as other statements were clearly improper.
The People, while candidly conceding that the summation did not ‘ ‘ rise to the character of exemplary advocacy ’ ’, argue lack of prejudice (Code Crim. Pro., § 542). It is true that most of the summation was devoted to a logical presentation of the evidence, but in a case such as this one, whose very nature tends to arouse emotions, we can have no sense of security that the summation did not prejudice the jury and, therefore, a new trial must be had (People v. Adams, 21 N Y 2d 397, 401-402; People v. Mleczko, 298 N. Y. 153, 163).
It is also contended that fundamental rights of ‘ ‘ due process ” were violated in the lineup procedures used in this case (People v. Brown, 20 N Y 2d 238, 243-244; People v. Ballott, 20 N Y 2d 600, 605-607; Stovall v. Denno, 388 U. S. 293, 299, 301-302). At the informal lineup, the defendant, standing at the complaint desk, was viewed by the two young victims through a mirror. The People claim that half a dozen persons were placed in a general room with the suspect. These people are not clearly described, and at least two were women. More *261 over, the younger girl was asked: 1 ‘ Does this look like the man? ” Thus her attention was specifically focused upon the defendant. The other victim also identified the defendant in this informal manner. This first lineup was clearly improper, constituting little more than a showup (People v. Brown, 20 N Y 2d 238, supra). In view of this, their later identification at a more formal lineup must be deemed suspect.
The opportunity which these two girls had to observe the defendant, while more than momentary, was not so substantial that we can say that, as a matter of law, the in-court identifications were not tainted by the improper lineup. Therefore, at the new trial the procedure prescribed by People v. Ballott (20 N Y 2d 600, supra) should be followed, and there should be a hearing outside the presence of the jury in which the People should demonstrate by ‘ ‘ clear and convincing ’ ’ evidence that the in-court identification was not the product of the suggestive circumstances surrounding the ‘ ‘ informal ’ ’ lineup.[1]
Although we find no other error, we deem it appropriate to comment on one other point raised by the defendant. During the course of the trial the court directed the defense to supply the prosecution with the prior statements of certain witnesses, who were called to testify on behalf of the defendant. It is defendant’s contention that this was improper. It is argued first that there was a possible violation of the right against self incrimination. We do not agree. These statements were not those of the defendant but of witnesses offered by the defendant. In no sense can it be said that he is being compelled to produce incriminating statements of his own. The privilege against self incrimination applies only to evidence of a testimonial or communicative nature obtained from the defendant himself (Schmerber v. California, 384 U. S. 757, 761; see, also, Jones v. Superior Ct., 58 Cal. 2d 56; Traynor, Ground Lost and Found in Criminal Discovery, 39 N. Y. U. L. Rev. 228, 246 n.; Note, 76 Harv. L. Rev. 838). We have recognized the defendant’s right to obtain and inspect statements of prosecution witnesses for possible use in cross-examining them (see People v. *262 Rosario, 9 N Y 2d 286). There is neither reason nor justification for not allowing the Peoplg to procure from the defendant statements taken from his witnesses for the same purpose of cross-examining them.[2]
The judgment of conviction should he reversed and a new trial ordered.
Chief Judge Fuld and Judges Burke, Scileppi, Bergan and Breitel concur; Judge Jasen taking no part.
Judgment reversed, etc.

. Since there must in any event be a new trial, we need not pass upon the question whether, assuming the girls’ in-court identification to be irrevocably tainted, the admission of the testimony may still be held “harmless error” in light of the other identification testimony in the record.

. In order to avoid situations where a prosecutor would be requesting the defendant to produce evidence which he may be privileged not to produce, the request for the production of such evidence should always be made out of the hearing of the jury.