**UNITED STATES of America**

v.

**Anthony F. WRIGHT, Appellant**

No. 72–1356.

United States Court of Appeals,
District of Columbia Circuit.

Argued Jan. 11, 1973.

Decided Oct. 9, 1973.

Rehearing Denied Dec. 27, 1973.

Stanley B. Cohen, Washington, D. C. (appointed by this court), for appellant.

William G. Schaffer, Washington, D. C., for the Public Defender Service.

Paul L. Friedman, Asst. U. S. Atty., with whom Harold H. Titus, Jr., U. S. Atty., and John A. Terry and Philip L. Cohan, Asst. U. S. Attys., were on the brief, for appellee.

Before BAZELON, Chief Judge, and WRIGHT and MacKINNON, Circuit Judges.

J. SKELLY WRIGHT, Circuit Judge:

Appellant's court-appointed counsel employed an investigator from the Pub-

lic Defender Service to interview potential witnesses. The investigator did so and sent to counsel a report consisting of summaries of the interviews. At trial the court ordered the investigator, who had testified as a defense witness, to turn over a copy of the report to the Government. The main question raised on this appeal concerns the propriety of this procedure. We believe the trial court erred in ordering disclosure of the report to the Government, and accordingly we reverse.

## I

Following a trial by jury, appellant was found guilty of armed robbery and assault with a dangerous weapon, for which he received concurrent sentences of two to six years and one to three years respectively. The Government's case consisted of the testimony of the victim, Lonnie Richardson, and two arresting officers. Accepting their testimony, appellant and another man confronted Richardson at a bus stop at about 3:30 one morning in August 1971, trying to sell him a charge-a-plate. Richardson rejected the offer and the two left. Richardson went off to get a cup of coffee to take home, and when he returned to the bus stop the two approached again and appellant asked if he had any money. Richardson testified that appellant threatened him with a soda bottle, saying he would "bust me in my head" if Richardson did not give them anything. Richardson admitted having some change in his change purse, and appellant removed 70 cents from the purse while his accomplice took a dollar from Richardson's pocket. The two then fled.

Immediately after the robbery, Richardson telephoned the police. When they arrived by car at about 4:00 A.M., Richardson got into the back seat of the car and began to give the officers descriptions of his assailants. While seated there he saw two men about a block away and told the officers they were the men who robbed him. The police drove up alongside the two men and arrested appellant. The accomplice ran away and was not apprehended. Richardson made an on-the-scene identification of appellant as one of the robbers.

In his opening statement defense counsel indicated he would prove Richardson was a homosexual. The trial court interrupted and called counsel to the bench, desiring an explanation of the relevance of Richardson's alleged homosexuality. Defense counsel said he intended to prove an occasion when Richardson saw appellant talking to a homosexual. Richardson allegedly stared at appellant and appellant did not return the stare. According to defense counsel, the stare indicated a desire on Richardson's part to make sexual advances toward appellant, and the robbery charge was fabricated because of appellant's failure to accede to the advances. The court felt the incident was so ambiguous and susceptible to misinterpretation that its proof would amount to an appeal to the jury to disbelieve Richardson simply because he was a homosexual. And it barred further reference to the matter.

Appellant offered two alibi witnesses. William Holloway testified that on the morning in question he was driving with appellant and Teresa Fleming, Holloway's cousin, near DuPont Circle and Rhode Island Avenue, N.W., far from the scene of the robbery. Defense counsel then called Teresa Fleming, who testified she had known appellant for a long time and was dating him the month the robbery allegedly took place. She was unable, however, to remember anything concerning the morning in question and was dismissed as a witness by the court since she had no relevant evidence to contribute.

Robert Reeves, an investigator for the Public Defender Service who had investigated the case for defense counsel, was the last defense witness. Reeves first testified about his examination of the lighting conditions at the scene of the crime. He then testified that he interviewed Richardson several months after the offense, recounting what Richardson had told him and relying on

his present recollection of the interview without reference to any notes or reports. With only minor exceptions,[1] Richardson's interview as reported by Reeves was consistent with Richardson's trial testimony. At the outset of his cross-examination of Reeves, the prosecutor moved for production of Reeves' investigative report. Over objection, the trial court ordered the report produced and turned over to the prosecutor.

The Government made two uses of the report. In cross-examining Reeves, the Government showed that Reeves had slightly misstated his interview with Richardson, thereby dispelling whatever minor inconsistencies existed between Richardson's in-court testimony and Richardson's interview as reported by Reeves' direct testimony.[2] More importantly, as the Government was quick to notice, the investigative report obtained from Reeves included not only a summary of Reeves' interview with Richardson, but also summaries of his interviews with other potential witnesses, including Miss Fleming, who Holloway testified accompanied Holloway and appellant as they drove around DuPont Circle about the time of the robbery. The investigative report read:

"8. On January 25, 1972, at about 7:30 P.M. this investigator called Miss Teresa Fleming by phone * * * and obtained the following information:

"a. Miss Fleming stated that she does know Anthony Wright, but he is not and never has been her boyfriend.

"b. Miss Fleming stated that she did not pick Anthony Wright up during the month of August or any other time at 2:00 or 3:00 a.m. and ride anywhere with him.

"c. Miss Fleming stated that she has never rode to DuPont Circle or 14th and Rhode Island Avenue, N.W., with Anthony Wright.

"d. Miss Fleming stated that if Anthony Wright said that he rode with her to visit anyone, he is a liar."

The Government quickly took advantage of this unexpected treasure. Reeves was called as a Government rebuttal witness; he recounted, over objection by defense counsel, that he had interviewed Miss Fleming, that she had denied ever driving around with appellant at 2:00 or 3:00 in the morning any time during August, and that she had said if appellant said otherwise he was a liar.

During its closing argument the Government told the jury it could take into consideration in its deliberations the demeanor of the defendant. The defense immediately objected—the defendant had not taken the stand and his demeanor as a witness was not at issue. The court overruled the objection and the Government proceeded to expand on the point, saying:

"Mr. Anthony Wright has been present throughout this trial, has found a good part of it humorous, other parts he couldn't stand. And you may definitely consider his demeanor in your deliberations."

The record does not reflect the precise conduct to which the prosecutor was referring, but it appears appellant's conduct led to his removal from the court-

---

1. As part of the Government's case-in-chief Richardson testified that he had seen appellant in the store at which Richardson worked on one previous occasion. According to Reeves, however, Richardson stated in the interview that he had worked in the store for about five years, that appellant had been a customer in the store for a period of about two years, and that Richardson had seen appellant in the store several times.

2. On cross-examination it appeared that Reeves' report said that Richardson had told

Reeves: "I was able to identify him because I know him when I see him. He has been a customer at the store where I work for several years. I know him by sight and by seeing him in the neighborhood over a period of several years." Thus, while Richardson had told Reeves that he had worked in the store for several years, he never specifically stated that he had seen appellant on several occasions in the store, but rather only that appellant "has been a customer at the store * * *."

room on one occasion after the jury had left, appellant in open court asked to be returned to his cell on another occasion, and appellant shouted something to the court at this time.

Three issues are raised on this appeal: (1) the court's refusal to allow the defense to present evidence showing that Richardson was a homosexual and had stared at appellant on one occasion; (2) the prosecutor's closing argument; and (3) the court's ruling that Reeves turn over his report to the Government.

## II

 The first two issues need not detain us long. We cannot say it was an abuse of the trial court's discretion to reject the line of questioning proffered by the defense with respect to homosexuality. As we have noted elsewhere, "Evidence of homosexuality has an enormous proclivity for humiliation and degradation of a participant in a fashion completely unrelated to testimonial honesty." Tinker v. United States, 135 U.S.App.D.C. 125, 127, 417 F.2d 542, 544, cert. denied, 396 U.S. 864, 90 S.Ct. 141, 24 L.Ed.2d 118 (1969). In ruling on evidentiary matters, the trial judge must balance the probative value of testimony against potential prejudice, and his exercise of discretion will not be disturbed on appeal save for grave abuse. *See* Hardy v. United States, 118 U.S.App.D. C. 253, 254, 335 F.2d 288, 289 (1964). Bias is unquestionably highly relevant [3] and rejection of a sexual advance may well give rise to bias, but here the proof of such an advance and its rejection was so ambiguous that the trial court cannot be said to have abused its discretion. Tinker v. United States, *supra*.

▪ We cannot accept the Government's contention that there was noth-

ing improper about the prosecutor's closing argument. A defendant has no right to disregard the dignity, order and decorum of judicial proceedings. Illinois v. Allen, 397 U.S. 337, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970). But this does not mean that his courtroom behavior off the witness stand is in any sense legally relevant to the question of his guilt or innocence of the crime charged. Unless and until the accused puts his character at issue by giving evidence of his good character or by taking the stand and raising an issue as to his credibility, the prosecutor is forbidden to introduce evidence of the bad character of the accused simply to prove that he is a bad man likely to engage in criminal conduct. *See* Michelson v. United States, 335 U.S. 469, 475–476, 69 S.Ct. 213, 93 L.Ed. 168 (1948); United States v. Fox, 154 U.S.App.D.C. 1, 4–5, 473 F.2d 131, 134–135 (1972).

 This basic principle cannot be circumvented by allowing the prosecutor to comment on the character of the accused as evidenced by his courtroom behavior. That the jury witnesses the courtroom behavior in any event does not make it proper for the prosecutor to tell them, with the court's approval, that they may consider it as evidence of guilt. What the jury may infer, given no help from the court, is one thing. What it may infer when the court in effect tells it that the courtroom behavior of the accused constitutes evidence against him is something altogether different. *Cf.* Griffin v. California, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965). If anything, when requested by the defense the proper course for the trial court where a defendant has engaged in unruly courtroom conduct is to instruct the jury to ignore the defendant's behavior in its deliberations.

---

**3.** "Our decisions reflect great solicitude for an endeavor by the accused to establish bias on the part of a prosecution witness. They establish the propriety of the showing either by cross-examination or by extrinsic evidence, and indicate the broad

range over which the inquiry may extend. * * * " Austin v. United States, 135 U.S.App.D.C. 240, 243, 418 F.2d 456, 459 (1969). (Footnotes omitted.)

## III

Although objection was made at trial, appellant has not specifically raised on this appeal the propriety of allowing the Government to call the defense investigator as a Government rebuttal witness and to question him about his interview with Miss Fleming. Appellate counsel may well have felt this issue was subsumed within the question, raised on appeal and in the District Court, of the court's ordering the investigator to give a copy of his report to the prosecutor, as it is evident that the prosecutor never would have known about the interview with Miss Fleming but for seeing the report. We think, however, the issues are analytically separable. Regardless of whether it was proper to order the report turned over to the prosecutor, a question we defer to Part IV *infra*, it was error to permit the prosecutor to question the investigator about his interview with Miss Fleming.

Whatever Miss Fleming told Reeves during the interview was hearsay coming from his mouth at trial. It was plainly an out-of-court statement introduced to prove the truth of the matter asserted, namely to refute Holloway's testimony that he had been driving around with Miss Fleming and appellant the morning of the robbery. Since Miss Fleming had previously been called as a witness for the defense, it might be argued that her prior statement to Reeves was admissible to impeach her in-court testimony. The problem with this approach, however, is that when called as a defense witness Miss Fleming could not remember anything concerning the morning in question. That she had contributed absolutely nothing to the defense case is indicated by the fact that the judge dismissed her as a witness without even giving the prosecution an opportunity to cross-examine her; nor did the prosecution seek such an opportunity.

Moreover, procedures governing introduction and use of prior inconsistent statements were not followed in this case. Before introducing extrinsic proof of a witness' prior inconsistent statement, the witness must be asked whether he or she made the statement and must be given an opportunity to explain it. Gordon v. Thomas, 63 App.D.C. 148, 70 F.2d 752 (1934); District of Columbia v. Chessin, 61 App.D.C. 260, 61 F.2d 523 (1932); Washington & O. D. Ry. Co. v. Smith, 53 App.D.C. 184, 289 F. 582 (1923); Gordon v. United States, 53 App.D.C. 154, 289 F. 552 (1923). *See also* 3A J. Wigmore Evidence § 1019 (Chadbourn rev. 1970); C. McCormick, Evidence § 37 (1954); Rule 613(b), Proposed Federal Rules of Evidence.[4] This procedure was not employed here; the prosecution did not even seek an opportunity to cross-examine Miss Fleming. More importantly, prior inconsistent statements are admissible only for impeachment purposes, not as substantive evidence to prove the truth of the matter asserted, and the jury should be instructed to this effect.[5] *See* United States v. McClain, 142 U.S. App.D.C. 213, 440 F.2d 241 (1971); Jones v. United States, 128 U.S.App.D.C. 36, 385 F.2d 296 (1967); Cannady v. United States, 122 U.S.App.D.C. 99, 351 F.2d 796 (1965); Byrd v. United States, 119 U.S.App.D.C. 360, 342 F.2d 939 (1965).

In the instant case, however, neither the prosecutor nor the trial court conceived of the investigator's testimony about his interview with Miss

---

4. *"(b) Extrinsic Evidence of Prior Inconsistent Statement by Witness.*—Extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate him thereon, or the interests of justice otherwise require. * * * *"

5. Rule 801(d)(1) of the Proposed Federal Rules of Evidence would amend this common law limitation by providing that prior inconsistent statements of a declarant who testified at trial and is subject to cross-examination are not hearsay. Until such time as the Proposed Rules become effective, *see* note 13 *infra*, the common law rule will be followed in this jurisdiction.

Fleming as impeaching her testimony as a defense witness; rather, they regarded it as substantive evidence that she did not drive around DuPont Circle and Rhode Island Avenue with Holloway and appellant the morning of the robbery. In his closing argument to the jury the prosecutor stated: "Mr. Holloway also told you that Teresa Fleming was with him. She told you she doesn't remember that at all. She just doesn't remember that at all. And, moreover, she told Robert Reeves * * * that if Anthony Wright said that, he's a liar." And the trial court did not give any instruction to limit the jury's use of the testimony. Nor can there be any doubt that the error was prejudicial, as it directly contradicted the sole defense raised at the trial.

## IV

■ Ordering a defense investigator to turn over a copy of his investigative report to the Government is such an unprecedented procedure that most of the legal questions it raises are as uncharted as they are fundamental. Among the issues we find lurking in use of the procedure in the instant case are: (1) the Fifth Amendment privilege against self-incrimination; (2) the permissible scope of discovery by the Government under Rule 16(c) of the Federal Rules of Criminal Procedure and application of the exceptions in that rule to discovery during trial; (3) the scope of the attorney-client privilege and its relation to investigators employed by defense counsel; (4) the scope of the "work product" doctrine in criminal procedure and its relation to investigators employed by defense counsel; (5) the relationship between the attorney-client privilege, the work product doctrine, and the Sixth Amendment's guarantee of effective assistance of counsel; [6] (6) the extent to which the attorney-client privilege and the protections of the work product doctrine are waived when the defense offers an investigator as a defense witness; (7) reconciliation of defense counsel's dual role as representative of his client's interests and officer of the court.

These are weighty issues indeed, and the court is inclined to avoid reaching them as much as possible. We think it best to begin by placing in perspective the trial court's production order in this case. Once having done so, it appears we can analyze the legality of the court's order without reaching most of these matters.

The transcript does not reflect any determination on the part of the trial court to break new ground in the law of criminal discovery, as the Government now asks us to do. Rather the production order seems to reflect simply a misapplication, in the hurry of an ongoing trial, of two basic rules of evidence and criminal procedure.

■ It is a hornbook rule of evidence that, had investigator Reeves used parts of his report to refresh his recollection while on the witness stand, the prosecution would be entitled to examine those parts of the report and would be permitted to make use of those parts of the report in cross-examining Reeves. Jackson v. United States, 5 Cir., 250 F. 2d 897, 900 (1958); United States v.

---

6. Adequate factual investigation is clearly a component of effective assistance of counsel, see, e. g., Shepherd v. Hunter, 10 Cir., 163 F.2d 872 (1967); People v. Bennett, 29 N. Y.2d 462, 329 N.Y.S.2d 801, 280 N.E.2d 637 (1972); American Bar Association Project on Standards for Criminal Justice, Standards Relating to the Defense Function § 4.1 (Approved Draft 1971), but providing such investigative assistance for the indigent defendant has proved difficult. See, e. g., Reilly v. Berry, 250 N.Y. 456, 461, 166 N.E. 165, 167 (1929); Note, The Indigent's Right to an Adequate Defense: Expert and Investigational Resources in Criminal Proceedings, 55° Corn.L.Rev. 632 (1970); Note, Right to Aid in Addition to Counsel for Indigent Defendants, 47 Minn.L.Rev. 1054 (1963). The District of Columbia Bar is fortunate in that the local Public Defender Service provides professional investigative and support services to court-appointed attorneys, and the operation of that Service would obviously be affected by the Government's proposal in this case.

Goldman, 2 Cir., 118 F.2d 310, 314–315, cert. denied, 313 U.S. 588, 61 S.Ct. 1109, 85 L.Ed. 1543 (1941); Capital Traction Co. v. Hoover, 45 App.D.C. 247, 253 (1916); 3 J. Wigmore, Evidence § 752 (Chadbourn rev. 1970). In the present case, however, it is evident Reeves did not use the report to refresh his recollection on the witness stand. Though we need not decide the question, even were we to accept an expansion of that rule to situations where the witness uses the document to refresh his recollection *before* testifying, *compare* Rule 612, Proposed Federal Rules of Evidence, *with* McGill v. United States, 106 U.S. App.D.C. 136, 270 F.2d 329 (1959), we still could not justify the court's production order. When the prosecution began its cross-examination of Reeves, no attempt was made to ascertain whether Reeves used the report to refresh his recollection prior to taking the stand. Indeed, the prosecution's first question on cross-examination was: "Could I have a copy of your report, please, Mr. Reeves?"

The Government now argues that Reeves must have referred to his report to refresh his recollection, but we can find nothing in the record warranting this assumption. Reeves testified he interviewed Richardson on January 19, 1972, and the trial took place on February 10–11, 1972, less than one month later. It is quite plausible that Reeves gave his testimony without refreshing his recollection by reference to his report.

■ In addition, the rules governing documents used to refresh recollection could in no event justify requiring Reeves to turn over his entire investigative report to the prosecution. As a defense witness Reeves testified only as to two matters—his interview with Richardson on January 19 and his exami-

nation of the lighting conditions at the scene of the crime. Assuming they had been used to refresh his recollection at trial, those parts of his investigative report relative to this testimony and of possible use to the Government in cross-examining Reeves with respect to this testimony would have to be turned over to the prosecution. But there was nothing in the investigative report on Reeves' examination of the lighting conditions. And the report contained much information totally irrelevant to the January 19 interview with Richardson, including summaries of interviews with police officers, another interview with Richardson, and the interview with Miss Fleming. Even if Reeves used the report to refresh his recollection, only those parts of the report relating to his testimony on direct need have been turned over to the Government. *See* 3 J. Wigmore, *supra*, § 762 at 140; *cf.* Mosson v. Liberty Fast Freight Co., 2 Cir., 124 F.2d 448 (1942).[7]

■ The second explanation for the trial court's production order is as a misapplication of the Jencks Act, 18 U. S.C. § 3500 (1970). That Act, the details of which are not here relevant, requires the *Government* to turn over to the defense prior statements of *Government* witnesses. By its express terms the Act has no application whatever to defense witnesses and statements in the possession of the defense. To the extent the trial court thought it was applying the Jencks Act, it was simply wrong in saying it made no difference whether Reeves was a defense or a Government witness.

Confronted with what appears to be no more than plain error in applying rules of evidence and criminal procedure, the Government now asks us to broaden these rules to encompass the court's production order. Simply stated,

---

7. *See also* Rule 612, Proposed Federal Rules of Evidence:

"* * * If it is claimed that the writing contains matters not related to the subject matter of the testimony, the judge shall examine the writing in camera, ex-

cise any portions not so related, and order delivery of the remainder to the party entitled thereto. Any portion withheld over objections shall be preserved and made available to the appellate court in the event of an appeal. * * *"

the Government proposes that this court adopt a common law rule of evidence and discovery which requires the defense, after its witness has testified on direct examination, to turn over to the prosecution prior statements of that witness in its possession so that those statements could be used by the Government to cross-examine the witness. In effect this rule would make the Jencks Act applicable in principle if not in express terms to the defense as well as to the prosecution.

Applying this rule to the present case, the defense would be required to turn over that part of Reeves' investigative report relating to Reeves' direct testimony [8]—that is, those parts of the report summarizing Reeves' interview with Richardson. Since Miss Fleming also testified as a defense witness, the Government contends the defense was required to turn over all of her prior statements in its possession, including Reeves' summary of his interview with her.[9]

Rather than focus on the issues delineated at the beginning of this section, we think the real question before us is whether we should develop a common law rule of evidence and criminal procedure which applies the Jencks Act to defense witnesses and their prior statements in the possession of the defense.

The Government couches its proposal in appealing language. We are reminded that "the judicial process *is* a search for truth, not an adversary game," United States v. Perry, 153 U.S.App.D. C. 89, 92, 471 F.2d 1057, 1063 (1972) (emphasis in original), and that "due process fairness and the interest of truth necessitate adjustment from the one-time conception of a criminal trial as a sporting contest between the two sides." United States v. Reese, 149 U. S.App.D.C. 427, 430, 463 F.2d 830, 833 (1972). With these truisms we cannot quarrel, but we nevertheless are compelled to reject the Government's invitation to take another small step forward on what Mr. Justice Holmes called "The Path of the Law.[10] "

The proposed rule, whether viewed as a rule of discovery at trial or as a rule of evidence, involves a significant change in traditional trial procedures. We have been cited to only a few state jurisdictions where similar rules have been adopted.[11] In addition, the Government's proposal touches upon matters which have been considered and treated in detail by statute and by rule.

■■■ The Government's proposal would, in effect, have us modify the language of the Jencks Act so it would apply to defense as well as Government

---

8. Under the Jencks Act, after a witness called by the United States has testified on direct examination the court must order the Government to produce any statement of the witness in its possession "which relates to the subject matter as to which the witness has testified." 18 U.S.C. § 3500(b) (1970). If the Government claims the statement contains matter not relating to the subject matter of the testimony of the witness, the court must hold an *in camera* inspection to excise portions of the statement not so relating. 18 U.S.C. § 3500(c).

9. The Government also argues that defense counsel had an ethical obligation as an officer of the court either to disclose the summary of the interview with Miss Fleming or to refrain from calling her as a defense witness, citing ABA Project, op. cit. *supra* note 6, at § 7.5(a). That section provides: "It is unprofessional conduct for a lawyer knowingly to offer false evidence, whether by

documents, tangible evidence, or the testimony of witnesses." Even assuming Miss Fleming's in-court testimony was inconsistent with her interview with the defense investigator, defense counsel may well have believed Miss Fleming was telling the truth on the stand and had lied to the investigator. Section 7.5(a) merely prohibits *knowingly* using false evidence or presenting a witness *knowing* that he intends to perjure himself. *See id.*, Commentary a, at 268. We reject the Government's contention that the record in this case indicates unprofessional conduct on the part of defense counsel.

10. Holmes, The Path of the Law, 10 Harv. L.Rev. 457 (1897).

11. State v. Montague, 55 N.J. 387, 262 A.2d 398 (1970); People v. Damon, 24 N.Y.2d 256, 299 N.Y.S.2d 830, 247 N.E.2d 651 (1969); People v. Sanders, 110 Ill.App.2d 85, 249 N.E.2d 124 (1969).

witnesses, achieving a result which even the Government admits was not within the contemplation of Congress. The rule-makers have dealt with this problem also, through promulgation of the Federal Rules of Criminal Procedure, particularly Rule 16(c). The Government concedes that Rule 16(c) is the only rule expressly dealing with a right of discovery on behalf of the Government. By its terms it applies only where the defense has taken advantage of reciprocal rights of discovery. Moreover, the rule entitles the Government to discover only documents "which the defendant intends to produce at trial * * * ."[12] Finally, the rule states:

"Except as to scientific or medical reports, this subdivision does not authorize the discovery or inspection of reports, memoranda, or other internal defense documents made by the defendant, or his attorneys or agents in connection with the investigation or defense of the case, or of statements made by the defendant, or by government or defense witnesses, or by prospective government or defense witnesses, to the defendant, his agents or attorneys."

The intent of the rule-makers was to immunize from discovery the material which would be subject to in-court discovery under the Government's proposal, since it expressly exempts "statements made by * * * defense witnesses, to the defendant['s] agents * * * ."

The rule-makers have also examined the matter covered by the Government's proposal very recently in Rule 612 of the Proposed Federal Rules of Evidence which provides:

"Except as otherwise provided in criminal proceedings by 18 USC § 3500 [the Jencks Act], if a witness uses a writing to refresh his memory for the purpose of testifying, either before or while testifying, an adverse party is entitled to have it produced at the hearing, to inspect it, to cross-examine the witness thereon, and to introduce in evidence those portions which relate to the testimony of the witness. * * * * "

The Advisory Committee's Note emphasizes the obvious:

" * * * The [Jencks Act] applies only to government witnesses; the rule applies to all witnesses. The statute contains no requirement that the statement be consulted for purposes of refreshment before or while testifying; the rule so requires. * * * * "

The Government's proposal would have us modify this rule of evidence, now being considered in Congress,[13] by doing away with the requirement that the statement be used to refresh recollection either before or while testifying.

In many areas of criminal procedure the courts bear a special responsibility for developing the common law to satisfy maturing notions of fairness and justice. Some of these areas—for example, definition of standards relating to insanity and criminal responsibility—are the courts' domain because the legislatures and the rule-makers have not yet seen fit to intrude on an historical

---

12. This limitation is central to the argument supporting the constitutionality of the rule. See I C. Wright, Federal Practice and Procedure § 255 at 520 (1969). Cf. Williams v. Florida, 399 U.S. 78, 90 S.Ct. 1893, 26 L. Ed.2d 446 (1970). See also Prudhomme v. Superior Court of Los Angeles County, 2 Cal.3d 320, 85 Cal.Rptr. 129, 134, 466 P.2d 673, 678 (1970):

" * * * A reasonable demand for factual information which * * * pertains to a particular defense or defenses and seeks only that information which defendant intends to introduce at trial, may present no substantial hazards of self-incrimination and therefore justify the trial judge in determining that under the facts and circumstances in the case before him it clearly appears that disclosure cannot possibly tend to incriminate defendant. However, unless those criteria are met, discovery should be refused."
(Footnotes omitted.)

13. The rules will not go into effect unless and until they are expressly approved by Congress. Pub.Law No. 93–12, 87 Stat. 9 (1973).

process of common law development. In other areas—for example, protection of the constitutional rights of the accused —the courts bear a special responsibility under our constitutional system since they, rather than the Congress or the rule-makers, remain the final arbiters of what the Constitution demands.

The present case, in contrast, is quite different. With respect to issues touched on by the Government's proposal, primary responsibility for development of the law has been assumed by Congress and the rule-makers. No doubt, there always remains room for case-by-case development of the law—to fill gaps in a statute or rule, to solve problems not considered by the draftsmen, or to interpret text in a manner which achieves substantial justice. The Government's proposal in this case, however, works a major change in procedure. Depending on one's perspective, it would expand or narrow the specific rights and privileges granted by statute and by rule, and would be in conflict with the plain language of these provisions. *Cf.* Palermo v. United States, 360 U.S. 343, 79 S.Ct. 1217, 3 L.Ed.2d 1287 (1959).

Equally if not more important, we cannot fail to recognize the weighty constitutional interests that could be affected by creating a right of discovery of prior statements of defense witnesses. In many instances the Government's rule would require the defense to turn over to the prosecution evidence incriminating the defendant. In this very case, for example, the rule is used to justify requiring the defense to turn over to the prosecution the prior statement of Miss Fleming which unquestionably tended to incriminate the defendant.

In other respects the rule would entail excessive judicial intrusion into the files of the defense. For example, Jencks

Act procedures require *in camera* inspection by the court to separate the parts of the prior statement relating to the witness' in-court testimony from the parts not so relating. Only matters relating to the in-court testimony must be turned over to the opposing side. *See* note 8 *supra*. Application of this procedure to statements in the possession of the defense would in some instances require the defense to open up its files to perusal by the trial court.

 In both these respects the procedure suggested by the Government raises, in our view, substantial questions as to its validity under the Fifth Amendment. The due process clause of the Constitution imposes an affirmative duty on the Government to reveal evidence helpful to the defense. Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The Jencks Act is only one aspect of this duty. *See* Jencks v. United States, 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103 (1957). The defense, however, has no reciprocal duty. "Although the Government is bound to disclose all exculpatory evidence within its control, defense counsel is under no obligation to reveal evidence which would aid the prosecution." Levin v. Katzenbach, 124 U.S.App.D.C. 158, 166, 363 F.2d 287, 295 (1966) (Burger, J., dissenting). Quite the contrary, the Fifth Amendment provides that the defense cannot be required to turn over evidence favorable to the prosecution. In criminal cases, then, discovery must inevitably remain basically a one-way street.[14]

This principle is firmly imbedded in our common law tradition. As Lord Mansfield once observed, "[I]n civil causes, the Court will force parties to produce evidence which may prove against themselves; or leave the refusal to do it (after proper notice) as a

---

14. Indeed, the only exception developed to date seems to be for pretrial disclosure to the Government of information the defendant intends to reveal at trial, as in Rule 16(c), and in notice of alibi statutes approved in Williams v. Florida, *supra* note 12, but there is serious question even as to the

permissible breadth of this exception under the Fifth Amendment. *Compare* Jones v. Superior Court of Nevada County, 58 Cal.2d 56, 22 Cal.Rptr. 879, 372 P.2d 919 (1962), *with* Prudhomme v. Superior Court of Los Angeles County, *supra* note 12.

strong presumption, to the jury. * * * But in a criminal or penal cause, the defendant is never forced to produce any evidence; though he should hold it in his hands, in Court." Roe dem. Haldane v. Harvey, 4 Burr. 2489, 98 Eng.Rep. 302, 305 (K.B. 1769). Production of documents in response to a motion to order production may be refused under the protection of the privilege. In Wigmore's words, "This is universally conceded." 8 J. Wigmore, Evidence § 2264 at 379 (McNaughton rev. 1961). The Supreme Court of the United States long ago recognized the point:

"* * * And any compulsory discovery by extorting the party's oath, or compelling the production of his private books and papers, to convict him of crime, or to forfeit his property, is contrary to the principles of a free government. It is abhorrent to the instincts of an Englishman; it is abhorrent to the instincts of an American. It may suit the purposes of despotic power; but it cannot abide the pure atmosphere of political liberty and personal freedom."

Boyd v. United States, 116 U.S. 616, 631–632, 6 S.Ct. 524, 533, 29 L.Ed. 746 (1886).[15]

15. The Government argues that the *Boyd* principle is limited to situations where the defendant is asked to produce his own prior incriminating statements, not the incriminating statements of others in his possession. It argues that the Fifth Amendment applies only where the incriminating product of compulsion is the defendant's testimony or "evidence relating to some communicative act or writing" by the defendant. *See* Schmerber v. California, 384 U.S. 757, 765, 86 S.Ct. 1826, 1833, 16 L.Ed.2d 908 (1966). This argument has evidently been accepted by those state courts which require the defense to produce prior statements of defense witnesses. *See, e. g.,* People v. Damon, *supra* note 11, 24 N.Y.2d at 261, 299 N.Y.S.2d at 834, 247 N.E.2d at 654: "These statements were not those of the defendant but of witnesses offered by the defendant. In no sense can it be said that he is being compelled to produce incriminating statements of his own."

This line of analysis, however, is plainly inconsistent with the rationale of the privilege. Dean Wigmore, no friend of the privilege, also concedes that the privilege applies only to "*testimonial* compulsion," 8 J. Wigmore, Evidence § 2263 at 379 (McNaughton rev. 1961) (emphasis in original). But as he says:

"* * * It follows that the production of *documents* or *chattels* by a person (whether ordinary witness or party witness) in response to a subpoena, or to a motion to order production, or to other form of *process relying on his moral responsibility for truthtelling,* may be refused under the protection of the privilege. This is universally conceded. For though the documents or chattels thus sought be not oral in form, and though they be already in existence and not desired to be first written and created by a

testimonial act or utterance of the person in response to the process, still there is a testimonial disclosure implicit in their production. It is the witness' assurance, compelled as an incident of the process, that the articles produced are the ones demanded. No meaningful distinction can be drawn between a communication necessarily implied by legally compelled conduct and one authenticating the articles expressly made under compulsion in court. * * *" *Id.,* § 2264 at 379–380 (footnote omitted; emphasis in original).

One of the basic rationales of the privilege is "our unwillingness to subject those suspected of crime to the cruel trilemma of self-accusation, perjury or contempt * * *." Murphy v. Waterfront Comm'n of New York Harbor, 378 U.S. 52, 55, 84 S.Ct. 1594, 1596, 12 L.Ed.2d 678 (1964). *See also* Couch v. United States, 409 U.S. 322, 328, 93 S.Ct. 611, 34 L.Ed.2d 548 (1973). Where the Government compels a defendant in a criminal case to produce a particular incriminating document, whether or not the document contains the defendant's own prior statements, the defendant faces this trilemma. He can produce the sought after document, thereby implicitly stating that the document produced is the one requested, and provide evidence against himself. He can perjure himself in two ways: he can refuse production on the ground that he does not have the requested item, or he can produce something other than the document requested— for example, a forged nonincriminating version of the document. Or he can simply refuse production and subject himself to a contempt sanction. Compelled production of a document in the possession of the defendant, whether or not it is a document written by the defendant, thus involves a "communicative act" by the defendant within the protection of the privilege. "[I]t is possession

There has been some attempt in recent years to increase the Government's right to discovery in criminal cases—for example, through statutes requiring the defense to give pretrial notice of the names of witnesses to be called as part of an alibi defense. But as the Supreme Court has emphasized in holding such statutes constitutional under the Fifth Amendment, they only require the defense to turn over to the Government information which the defense intends to reveal at trial. *See* Williams v. Florida, 399 U.S. 78, 85, 90 S.Ct. 1893, 26 L.Ed. 2d 446 (1970). Alibi statutes, the Court reasoned, affect only the *timing*

disclosure,[16] and the defendant has no Fifth Amendment privilege to mount an eleventh hour defense. *Id.* at 82, 90 S. Ct. 1893. The Government's proposal in the instant case is entirely different. It would require the defense to turn over information which the defense never intended to use at trial.

The Government's proposal does not further any legitimate governmental interest in avoiding surprise at trial. *Compare* Wardius v. Oregon, 412 U.S. 470, 93 S.Ct. 2208, 37 L.Ed.2d 82 (1973). Under *Williams* and pursuant to Rule 87 of the District Court Rules,[17]

of papers sought by the government, not ownership, which sets the stage for exercise of the governmental compulsion which it is the purpose of the privilege to prohibit." Couch v. United States, *supra*, 409 U.S. at 330 n. 12, 93 S.Ct. at 617, *quoting* United States v. Cohen, 9 Cir., 388 F.2d 464, 468 (1967). *See also* United States v. White, 322 U.S. 694, 699, 64 S.Ct. 1248, 88 L.Ed. 1542 (1944); In re Grant, S.D.N.Y., 198 F. 708, 709 (1912) (Hand, J.), affirmed, 227 U.S. 74, 33 S.Ct. 190, 57 L.Ed. 423 (1913):

" * * * For instance, suppose that A., knowing that B. has papers which would incriminate him, gets wrongful possession of them from B., whom they do not incriminate. If B. is content, and leaves A. in possession, I do not understand that it would be any answer whatever to A. to say: 'You cannot keep these back, because you came by them wrongfully, or at least you have no right to them now.' All the law considers is whether A. has got possession in fact, and whether the documents actually will tend to incriminate him. To get them in evidence the law would have to force him to bring them out of a possession which is good enough against any one but B. Certainly, I can find nothing in the books which suggests such a distinction, and it contradicts the whole history of the matter. For the privilege runs along side by side with the power to compel production, and that power depends only upon serving the actual possessor. * * * *"

*Schmerber*, which involved compelled withdrawal of a blood sample from the defendant, is fully consistent with this approach. In permitting his blood to be removed, an individual makes no implicit statement comparable to that implicit in producing a requested document. The defendant need not choose between incrimination and perjury,

since no opportunity for perjury is intrinsic to the procedure. As the Court noted in *Schmerber*, "Petitioner's testimonial capacities were in no way implicated; indeed, his participation, except as a donor, was irrelevant to the results of the test, which depend on chemical analysis and on that alone." 384 U.S. at 765, 86 S.Ct. at 1832.

16. *See* Note, The Supreme Court 1969 Term, 84 Harv.L.Rev. 1, 171 (1970). In this respect alibi statutes are similar to the kind of discovery permitted by the Government under Rule 16(c). *See* text at pp. 1190–1191 *supra*. Even the proposed amendments to Rule 16(c), which broaden prosecutorial discovery in several respects, would continue to limit discovery to documents "which the defendant intends to introduce in evidence at the trial" or the names and addresses of the witnesses "he intends to call at the trial." *See* Preliminary Draft of Proposed Amendments to the Federal Rules of Criminal Procedure for the United States District Courts, 48 F.R.D. 553, 591–592 (Rules 16(b)(1)(i) & (iii)) (1970).

17. DEFENSE OF ALIBI
 (A) DEMAND BY PROSECUTOR: NOTICE BY DEFENDANT. When a defendant in a criminal case proposes to offer the defense of alibi, he shall, unless the judge at pretrial directs otherwise, upon written demand of the prosecutor stating the time, date and place at which the alleged offense was committed, serve upon the prosecutor within 20 days a written notice of his intention, and shall state therein the specific place or places at which the defendant claims to have been at the time of the alleged offense and the names and addresses of the witnesses upon whom he intends to rely to establish such alibi.
 (B) NOTICE BY PROSECUTOR. Within ten (10) days thereafter, prosecu-

the Government could have compelled pretrial disclosure of the names of alibi witnesses, including Miss Fleming, in advance of trial. The Government could then have interviewed those witnesses in an effort to obtain impeachment or rebuttal evidence. But the Government did not avail itself of this procedure. Instead it seeks a rule which does not help it avoid surprise, but, rather, helps it make its case against the accused.

■■■ The defendant has a right under the Fifth Amendment to compel the state to investigate its own case, find its own evidence, and prove its own facts. The defense has no duty to help the prosecution convict the defendant. We therefore reject any rule which would require the defense to turn over to the prosecution prior statements of defense witnesses which could be used by the prosecution as evidence against the accused.

Reversed.

MacKINNON, Circuit Judge, dissenting:

I see no privilege in the report of an investigator for the defense to the extent that it contains statements of witnesses (not the defendant). I accordingly believe that the court properly ordered it to be produced. Investigative reports of the Government are required to be turned over to the defense when they contain facts contrary to those testified in court and I would apply the same standard to investigators for the defense. Since I find no error in the trial I would accordingly affirm the judgment of conviction.

tor shall serve upon the defendant or his attorney a written notice stating the names and addresses of the witnesses upon whom the Government intends to rely to establish the defendant's presence at the scene of the alleged offense.

(C) FAILURE TO COMPLY: RIGHT OF DEFENDANT TO TESTIFY. Upon the failure of either party to comply with the respective requirements of this rule, the Court shall, except for good cause shown, exclude the testimony of any witness offered by such party as to the defendant's absence from, or presence at, the scene of the alleged offense. This rule shall not limit the right of the defendant to testify in his own behalf.