■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v JOSE RAMOS, Also Known as ALFREDO ORTIZ, Appellant.—Appeal by defendant from a judgment of the Supreme Court, Kings County, rendered October 5, 1973, convicting him of burglary in the first degree and possession of weapons, etc., as a felony, upon a jury verdict, and imposing sentence. The appeal brings up for review a decision of the same court, made August 21, 1973, after a hearing, which denied defendant's motion to suppress identification testimony. Judgment affirmed. No opinion. Cohalan, Acting P. J., Damiani and Titone, JJ., concur; Margett, J., concurs in the affirmance of the conviction of possession of weapons, etc., as a felony, but otherwise dissents and votes to grant the motion to suppress identification testimony

and to modify the judgment by reversing the conviction of burglary in the first degree, and the sentence imposed thereon, and dismissing the said count, with the following memorandum, in which Rabin, J., concurs: In the early morning hours of October 17, 1972, Mrs. Carmen Jiminez was alone in her apartment in Brooklyn, New York, when she heard a knock at her door. Thinking that it was her sister Norma, she opened the door. Upon opening the door a man pushed her sister aside, showed Mrs. Jiminez a knife, tried to stab her and threatened to kill her if she screamed. When she saw the knife, Mrs. Jiminez ran down the entrance hallway of the apartment, through the kitchen and into the living room. She made her escape through the living room window by jumping to the ground. After this she joined her sister on the sidewalk. Shortly thereafter they encountered a patrol car. Mrs. Jiminez described the assailant to the officers as a Puerto Rican, with black hair and a dark complexion, whose height was about five feet, six inches. She said he was wearing a light shirt and dark slacks. She had never seen him prior to the described incident.* In addition to the officers, she also told her brother about what had transpired. Later that same morning her brother returned to the Jiminez apartment and informed her "that they had arrested the man." Early that same morning, the police awakened her and also told her "that they had arrested the man." She was escorted to the police station and into a back room where the defendant was seated in a chair; he was handcuffed and was surrounded by uniformed officers. Her initial identification of the defendant occurred at approximately 6:00 A.M. that morning, or about six hours after the incident. Mrs. Jiminez appeared in Criminal Court that same day and again identified the defendant. Norma Jiminez, the complainant's 13-year-old sister, did not see the alleged perpetrator of the burglary again until almost 10 months after the incident. On the night of the incident, just prior to knocking on her sister's door, a man approached her, pushed her and threatened her with a knife. As he thrust the knife at her, she ran down the stairs. Admittedly she was somewhat uncertain as to the identity of her attacker. In fact, prior to her testimony at the *Wade* hearing, the Assistant District Attorney informed her that, if she couldn't identify anyone in the courtroom whom she had seen before, she should say so. Her identification of the defendant occurred at the *Wade* hearing. In the presence of the hearing Judge, the court stenographer, the court clerk, two Assistant District Attorneys, defense counsel, two Legal Aid Society lawyers, two uniformed court officers, and the defendant, the following colloquy occurred: "Q Who did you see? A That man. Q Do you see him in the court? A No. Q Do you see him in court? Look around the courtroom, look around the courtroom. Do you see him? A No. Q Do you think you would recognize the man if you saw him again? A Really, I don't know if I would recognize him. THE COURT: Look around the courtroom. Do you see him? THE WITNESS: Yes. Now I see him. Q Would you point him out? Come

---

* Although not dispositive on the issues raised herein, it is interesting to note that there were substantial contradictions in her testimony with that given by the arresting officer. Although Carmen Jiminez testified that she had never seen the defendant before, Officer Williams testified that she had told him that her assailant's name was Jose. That she may have known the defendant before is partially corroborated by the defendant's statement, at the time of his arrest, that "I know her, she's crazy." Moreover, when the defendant was arrested, he was wearing a brightly colored shirt, although Mrs. Jiminez told Officer Williams that he was wearing a light shirt and dark slacks. The UF 61 Report filed by another officer indicated that the burglar had worn a brown suit.

down, please. THE COURT: Indicating the defendant." Criminal Term held that the procedure employed by the police in leading Mrs. Jiminez into a room in which the defendant was seated was improper, but since her in-court identification was based upon her own independent recollection, that latter testimony would not be suppressed at the trial. The hearing court also held that Norma's in-court identification was based upon her own independent recollection and was not tainted by any improper confrontation. This is apparently the position taken by the majority in affirming the defendant's conviction. It is my view that the procedure employed by the police in arranging a showup at the precinct only a few hours after the crime was impermissible and that Mrs. Jiminez' subsequent identification of the defendant at the trial was based upon that suggestive process, rather than upon her own independent recollection. Moreover, the in-court identification by Norma Jiminez amounted to no more than another impermissible showup, made even more egregious by the lengthy passage of time from the date of the defendant's arrest until the date of the *Wade* hearing, during which time no proper lineup was arranged. Her testimony at the hearing itself clearly established her indecision in making any positive identification. Station house showups similar to the one described above have frequently been condemned where the People failed to demonstrate that compelling circumstances necessitated such inherently suggestive procedures (see *People v Rahming*, 26 NY2d 411; *People v Damon*, 24 NY2d 256). The events prior to the station house identification also contain a certain measure of impermissible suggestion employed by the police. At the time she was awakened by the police in the very early hours of the morning, she was informed by them that "the man" who had threatened her had been arrested. It is evident that such a remark is suggestive. It tends to increase the probability that an uncertain witness will make a positive identification (see *People v Rahming, supra; People v Damon, supra; People v Robles*, 46 AD2d 748). Certainly the fact that she was awakened at such an early hour and rushed to the police station to participate in the identification process also had a somewhat suggestive effect, especially after she was told that the perpetrator was in custody. This was not an on-the-scene showup, which is often justified as a means for the police to continue their investigation with deliberate speed (cf. *People v Jones*, 38 AD2d 745). A properly arranged lineup would not have jeopardized any ongoing investigation; nor would it have prejudiced intelligent police procedure to any degree. The witness' memory would still remain relatively fresh if the identification process were postponed only a few hours. In short, the police opted for a confrontation which occurred beyond the immediate needs of an on-the-scene identification, but they did not undertake the requisite precautions to insure that Mrs. Jiminez' identification was impartially arrived at. Whatever impropriety had occurred at the station house was compounded by her subsequent in-court identification only a few hours later. The inevitable result was the bolstering of a tainted identification (see *People v Hanley*, 32 AD2d 1039, mod 27 NY2d 648; *People v Ames*, 49 AD2d 514; *People v Cooper*, 31 AD2d 814). The evidence adduced at the *Wade* hearing indicates that Mrs. Jiminez saw the perpetrator for a fleeting instant and under traumatic circumstances in which she was threatened by a man brandishing a knife. Even though she testified that she "stayed looking at his face and how he looked", she attempted to escape immediately upon seeing the knife, which occurred simultaneously with her initial observation of the perpetrator. Her lack of reluctance to make an identification of some sort is also illustrated by her identification of the knife which was recovered from the person of the

defendant as the one which was used to effectuate the crime. This was accomplished even though the knife apparently had no distinguishing characteristics. Minutes after the crime occurred she was able to give only a minimal description of her assailant, which hardly distinguished him from any other Puerto Rican. The description was so scarce that no alarm was ever issued. Her testimony, that she saw him for a total of five minutes, is dubious at best and patently misleading. This minimal observation was subsequently impermissibly bolstered by the showup at the police station and at the defendant's arraignment later that day. In short, this is the classic use of the suggestive procedure utilized to supply the uncertain witness with the assurance she needs to make a positive identification. The process by which the younger Jiminez identified the defendant was just as objectionable. My conclusion is that there was no source for her in-court identification of defendant other than her *Wade* hearing identification. The purpose of a pretrial *Wade* hearing is to determine whether any identification procedures employed by the police have been impermissibly suggestive and have compromised the witness' ability to make an independent identification at the trial. Inasmuch as the authorities waited 10 months between the time of the arrest and the *Wade* hearing, without arranging any lineup or photographic display, what could have been the purpose behind the prosecutor's decision to call this witness at the hearing and to permit her to make the in-court identification at that time? It was not done to bolster other identification testimony since the evidence received at a *Wade* hearing presents distinct issues as to each potential trial witness and is in no way cumulative. I choose not to accept the People's contention that the production of this witness at the hearing was the result of an erroneous suggestion by the trial court that any prosecution witness who is called at trial should be examined at this hearing. Leaving aside the fact that this contention is dehors the record, the decision to submit such evidence at a *Wade* hearing rests solely with the prosecutor, who knew by the time of the hearing that the defendant had not yet been subjected to any identification process involving Norma Jiminez. In any event, this alleged suggestion did not amount to a directive. Thus, it defies credulity to accept the premise that the prosecutor, knowing that he could not possibly be prejudiced in a legal sense by not calling the younger Jiminez at the hearing, simply did so because the court suggested that it be done. The motives of the prosecutor in choosing to submit the defendant to this procedure are quite relevant to our inquiry. The circumstances under which Norma identified the defendant were suggestive and conducive to mistaken identification. The defendant was the only Puerto Rican in the room. The other persons present were markedly distinguishable in terms of their attire and general appearance. Of course, the defendant was seated at the defense counsel's table, which is the very place at which even the most naive and untrained witness could expect to find him (cf. *United States v Roth,* 430 F2d 1137, 1141). The witness was asked several times to look around the courtroom to see if she could identify her assailant. After much initial difficulty, which existed despite the suggestiveness of the atmosphere, she finally identified the defendant. Suffice to say, if this same scenario had occurred at a police station the confrontation would be labelled improper and suggestive (see *People v Ballott,* 20 NY2d 600; *People v Damon, supra).* The essential question posed therefore is whether the courtroom confrontation raises a due process issue under *Stovall v Denno* (388 US 293) and its progeny. As of this date it appears that the courts of this State have not addressed themselves to the precise issue of whether a courtroom showup impermissi-

bly infringes upon one's due process rights. Our Court of Appeals has recently written on the issue of when the right to counsel attaches in an adversary proceeding for the specific purpose of counsel's availability at a lineup. In attempting to place its holding in its over-all context, the court noted in *People v Blake* (35 NY2d 331, 340): "Beyond the right to counsel it is still good law that any improperly suggestive viewing *at any time* may constitute a violation of due process of law (see *Stovall v. Denno,* 388 U. S. 293, 301–302; *supra; People v. Ballott,* 20 N Y 2d 600, 606; cf. *People v. Brown,* 20 N Y 2d 238, 243)" (emphasis supplied). It must be remembered that the exclusionary rules which prevent the introduction of certain identification testimony were primarily fashioned to deter improper conduct on the part of law enforcement officials which might lead to mistaken identifications (see *Stovall v Denno, supra,* p 297; *People v Logan,* 25 NY2d 184, 193). The focus is not solely upon the time or place at which the confrontation occurs, but also upon the motives and conduct of the law enforcement officials in obtaining prior identification evidence. Thus, it has been held that pretrial identification procedures which occur in a prosecutor's office, or during grand jury proceedings, are proper subjects for judicial scrutiny so as to gauge possible constitutional violations *(People v Leite,* 78 Misc 2d 296). So, too, viewings of the defendant in or around the courtroom at various stages of the criminal proceedings have also come under judicial scrutiny (see *People v Grier,* 45 AD2d 688; *People v Robles, supra; People v Hanley, supra).* In *United States v Roth (supra,* p 1141), a witness who had not yet testified was asked by the prosecutor to walk through the courtroom during a trial recess to see if a man who had allegedly defrauded him was in the courtroom. The witness complied and made an identification of a man (presumably the defendant). His identification testimony at the trial was equivocal. The Second Circuit held the *Wade* principles applicable to such a confrontation, but, despite the violation of the *Wade* requirements, no reversal was mandated inasmuch as the viewing had neither tainted the witness' trial testimony nor infected the trial. In *United States v Kaylor* (491 F2d 1127), a witness who the prosecution believed could not identify the defendant was called at the trial on an issue unrelated to identification. Following his testimony he informed the prosecutor that he could identify the defendant as one of the perpetrators. After a hearing the trial court held that no taint resulted from the in-court identification. The Second Circuit held that the identification process was, in essence, a prohibited showup, but that no due process violation resulted since "there is not the slightest suggestion that the prosecution was in any way attempting to bring the confrontation about in the fashion that it occurred" (p 1132). The rule gleaned from a study of these cases is that the due process clause is violated only where the identification is the result of improper conduct by law enforcement officials. Consequently, our courts have held that spontaneous or unrehearsed one-to-one viewings are outside the pale of condemned showups (see *People v Logan, supra,* p 193). As noted above, the motives of the prosecutor here are subject to serious question. In employing this questionable procedure, the People were able to arrange a suggestive identification procedure prior to the trial so that its case could eventually be significantly bolstered by an additional eyewitness at the trial. By engaging in this screening technique, the People were able to test the credibility of the witness without the potential negative result which could conceivably occur if the witness was produced for identification testimony in the first instance before a jury at the trial. If the prosecutor was sincerely interested in whether this witness would be able to recognize the defendant as the

perpetrator, an impartial lineup, with counsel present, could have been arranged. In the absence of this procedure, my only conclusion must be that a confrontation was arranged so that this witness would not fail to recognize the defendant in front of the jury as she did at the hearing. Defense counsel's failure to object to the in-court identification process raises some doubt as to his good faith in acquiescing to this confrontation. However, it is my view that the confrontation was so suggestive and prejudicial that his failure to object does not constitute a waiver of his right to submit this issue on appeal (see CPL 470.15, subd 6). The above-quoted testimony from the transcript of the *Wade* hearing serves to demonstrate the inherent weakness of Norma's identification of the defendant. She had, at most, a minimal opportunity to observe the perpetrator before she retreated down the stairs. She was unable to recollect even the most basic characteristics of the man she observed. During the lengthy passage of time between the incident and the hearing, whatever small recollection of the perpetrator she had significantly dissipated. Therefore, I conclude that the testimony of Norma Jiminez was solely the result of the suggestive confrontation and was clearly not based upon any independent recollection of the incident. Accordingly, it is my view that it was error to deny the defendant's motion to suppress the identification testimony of both Carmen and Norma Jiminez. I also note that, since the burglary conviction was based entirely upon their testimony, the judgment of conviction on that count must be reversed and the indictment dismissed. Inasmuch as the evidence clearly supports the defendant's illegal possession of a gravity knife, his conviction under section 265.05 of the Penal Law must be affirmed.