# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
November 12, 2014 Session

## STATE OF TENNESSEE v. JIMMIE LEE REEDER

**Direct Appeal from the Circuit Court for Cheatham County**
**No. 16157     Larry Wallace, Judge**

_____

**No. M2013-02538-CCA-R3-CD - Filed May 12, 2015**

_____

A Cheatham County Circuit Court Jury convicted the appellant, Jimmy Lee Reeder, of rape of a child, a Class A felony, and aggravated sexual battery, a Class B felony. After a sentencing hearing, he received an effective thirty-five-year sentence to be served at 100%. On appeal, the appellant contends that he was denied his right to an impartial jury, that the prosecutor engaged in misconduct during the State's case-in-chief and closing arguments, and that the trial court's decision to exclude any evidence regarding prior allegations of sexual abuse of the victim deprived him of his right to present a defense. Based upon the oral arguments, the record, and the parties' briefs, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court are Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN, and ROBERT H. MONTGOMERY, JR., JJ., joined.

James L. Baum, Burns, Tennessee, for the appellant, Jimmie Lee Reeder.

Herbert H. Slatery III, Attorney General and Reporter; Sophia S. Lee, Senior Counsel; Dan Mitchum Alsobrooks, District Attorney General; and Wendell Ray Crouch, Jr., Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### I.  Factual Background

The appellant was tried for rape of a child and aggravated sexual battery. Although he does not contest the sufficiency of the evidence, we will summarize the evidence presented at trial.

Detective Jason Matlock of the Ashland City Police Department testified that he began investigating this case in February 2009 and that he interviewed the appellant on February 12, 2009. Detective Matlock arrested the appellant on March 5, 2009, and interviewed him again. During both interviews, the appellant claimed he had no idea why the police wanted to speak with him. When the police advised him that the case involved a young girl's allegations of sexual abuse, the appellant never asked them to identify the child.

On cross-examination, Detective Matlock acknowledged that before the interviews, the appellant had been in a custody dispute with the appellant's ex-wife and "had tried to bring charges against a Jody Jones." During the interviews, the appellant made statements indicating that he thought the interviews were related to the custody dispute or his problems with Jones. Someone from the Child Advocacy Center (CAC) interviewed the victim twice, and Deputy Matlock viewed both interviews. He acknowledged that the victim made three allegations of rape: that the appellant penetrated her anus with his penis, that the appellant penetrated her vagina with his penis, and that the appellant digitally penetrated the victim. However, Detective Matlock charged the appellant with only one count of rape of a child for the appellant's digitally penetrating the victim. He said he charged the appellant "based on our investigation and probable cause on those particular charges."

The State played the appellant's interviews for the jury. During both interviews, the appellant invoked his right to counsel when the police advised him that they wanted to question him about allegations of child sexual abuse. Although the police did not question him about the crimes, the appellant continued talking to the officers, telling them about the situation with his wife and his problems with Jones. During his March 2009 interview, the appellant also told them that he was going to church and that he and his children had been baptized.[1]

Mary Barnhill testified that the victim's mother was Barnhill's foster daughter. After the victim was born, the victim's mother was unable to care for her, so Barnhill obtained custody of the victim and raised her. In September 2008, the victim was six years old. The appellant and his three children lived next door, and the victim would go to his house to play with his children. In January 2009, Penny Hackney, whom Barnhill described as "a friend of a friend," was living with Barnhill. The victim revealed sexual abuse to Hackney, and

---

[1]Before trial, defense counsel filed a motion to exclude the appellant's invocations of his right to counsel from the interviews. The trial court ruled that the State would have to redact the appellant's request for a lawyer from the recordings. However, nothing indicates that the State did so. In fact, after the State played the appellant's first interview, it specifically questioned Detective Matlock about the appellant's invoking his right to counsel. Defense counsel objected, and the trial court overruled the objection. The appellant does not raise this issue on appeal.

Barnhill learned about the victim's allegations. Barnhill talked with the victim, and the victim told her about the abuse. Barnhill said that prior to the victim's disclosure, she never noticed any change in the victim's behavior. She said she no longer had custody of the victim because her nephew had adopted the victim.

Deputy Jeremy Ethridge testified that in March 2009, he worked for the Ashland City Police Department. On March 5, 2009, he walked the appellant from the police department to the jail. He stated that en route, the appellant told him that "his kids were at home when this incident occurred." On cross-examination, Deputy Ethridge acknowledged that in his report, he wrote that the appellant told him that "'the kids were at home during that.'" He acknowledged that he did not know what the appellant meant by that statement.

The then eleven-year-old victim testified that she had known the appellant "[a] long time" and used to go to his house to play with his children. She said that the appellant "put his wiener in my butt," that the incident happened in the appellant's bedroom, and that she thought it occurred in 2009 when she was in kindergarten. The State asked her how many times the appellant touched her, and she said he touched her only one time. The victim told Hackney, and Hackney told Barnhill. The victim acknowledged that someone interviewed her at the CAC, and she said that she told the truth during the interview. She stated that the appellant's putting his penis in her anus hurt "[r]eally bad" and that he told her not to tell "our secret." The victim was afraid to tell anyone because she thought she would get in trouble.

On cross-examination, the victim testified that in 2009, she lived with her "Mamaw," Mary Barnhill, and "Papaw," James Barnhill. The victim said that in order to prepare for trial, she watched the videos of her CAC interview and talked with her father and the assistant district attorney general. The victim acknowledged that she alleged the appellant touched her "bad spot" on the inside; that he put his "bad spot," meaning his penis, in her "bad spot"; and that he put his "bad spot," meaning his penis, in her "butt all the way." The incidents occurred on different days in the appellant's bedroom. During the incidents, the appellant's bedroom door was open, and his children were watching television in the living room. Defense counsel asked if the appellant's two daughters were ever in the bedroom, and she said yes. However, the appellant's son was never in the room. The victim acknowledged that despite the abuse, she continued to go to the appellant's house to play.

The victim testified that she told Hackney that the appellant "put his wiener in my bad spot and butt and . . . I told her stuff about it." She acknowledged that Hackney's statement did not say that the appellant penetrated the victim's anus with his penis or that he put his "bad spot" in her "bad spot." The victim told an interviewer at the Our Kids Center that the appellant put his hand inside her "butt," but she never revealed the incident to anyone at the

-3-

CAC, anyone at the Department of Children's Services (DCS), or Hackney. The victim also never told anyone at the CAC that the appellant "put his wiener in [her] butt all the way." The victim said she was confused when she talked to Hackney and during her interviews at the CAC and DCS. The victim acknowledged telling someone at the CAC that the appellant should go to jail so that the appellant's ex-wife could move back into the house with the children. She also acknowledged that she liked the appellant's ex-wife. The victim denied making false allegations of sexual abuse previously.

Hollye Gallion, the Clinical Director and a nurse practitioner at the Our Kids Center, testified as an expert in the diagnosis and treatment of child sexual abuse that she evaluated the victim on February 17, 2009. When Gallion asked the victim to identify her "private" areas, the victim said "'bad spot'" and "pointed to her front genitalia and butt." The victim told Gallion that the appellant touched the inside of her bad spot with his finger. The victim also said that the appellant touched the inside of her "butt" with his hand and that he put a bag over his penis and made her touch it. Gallion examined the victim but found no signs of trauma, injury, or infection. She stated that the victim's having a normal physical exam was not unusual because the body could heal quickly. Also, those parts of the body were "pretty flexible" so that an examiner often could not detect penetration.

Kim Stringfield Davis testified that she was the Executive Director of the CAC and interviewed the victim in February and March 2009. The interviews were video recorded. During the first interview, the victim looked at anatomical drawings of a female child and an adult male. Davis said that the victim identified the "bad spot" on both drawings as the genital area. The State played the interviews for the jury.

During the victim's February interview, she said that the appellant "touched me in a bad spot" and "made me touch him in a bad spot." She said the appellant touched her bad spot more than one time. She said he also rubbed her, pulled down her pants, and licked her "butt." On the anatomical drawing of the girl, the victim circled the buttocks and the genitalia as the places the appellant touched. At first, she said that the appellant touched her private with his tongue. However, she then stated that he touched her private with his hand. She said that his hand went inside her private and that it hurt. The victim said that the appellant also licked her "butt" with his tongue and that he put a brown bag over his bad spot and made her touch it. The incidents happened in the appellant's bedroom, and the appellant's three children were watching television in the living room at the time. The bedroom door was open, but the appellant's children did not see what was happening. The victim said that during the incident with the bag, the appellant's youngest daughter was in the bedroom "looking at the t.v." At the end of the victim's interview, she said that the appellant licked her "butt" while she was on his bed. She said that he put his hand inside her pants and panties, rubbed her private, and put a bag on his private and made her touch it.

-4-

However, that incident occurred on the couch.

During the victim's March interview, she said she forgot to tell Davis that the appellant "licked me in the private." The victim and the appellant were on his bed, and the appellant's youngest daughter was in the living room. The victim said that her clothes were on and that the appellant licked her private over her clothes. The victim and Davis then discussed some of the victim's allegations from the February interview. Later, Davis asked the victim, "What made him stop doing all that?" The victim answered, "When he got baptized."

The appellant's son and two younger daughters, who were twelve, ten, and eight years old at the time of trial, testified on the appellant's behalf. They all stated that the victim used to come over to their house to play and that they either played outside or in the girls' bedroom. All of them said that they never saw the victim with the appellant in his bedroom or saw the appellant touch the victim in a bad way.

The jury convicted the appellant of one count of rape of a child, a Class A felony, and one count of aggravated sexual battery, a Class B felony.[2] After a sentencing hearing, the trial court sentenced him to twenty-five and ten years, respectively, to be served consecutively at 100%.

## II.  Analysis

### A.  Impartial Jury

The appellant contends that he was denied his right to an impartial jury because one the of the jurors failed to reveal that she knew one of the State's potential witnesses, Jody Jones, or that her brother-in-law had been convicted of a sexual offense involving one of her nieces. The State contends that the appellant is not entitled to relief because he failed to show actual bias by the juror. We agree with the State that the appellant is not entitled to relief.

At the beginning of jury voir dire, the State read a list of potential witnesses and potential rebuttal witnesses, including "Jody Jones." The trial court asked the potential jurors

---

[2]The State did not make a formal election of offenses at the close of it's case-in-chief. However, during its closing argument, the State referred to the appellant's inserting his penis in the victim's anus and his putting a bag over his penis and forcing the victim to touch it. See State v. Anthony Allen, No. W2004-01085-CCA-R3-CD, 2005 Tenn. Crim. App. LEXIS 696, at *43 (Jackson, July 8, 2005) (stating that "[a] prosecutor's closing argument may effectively serve as an election of offenses").

if they knew any of the potential witnesses, and several of them raised their hands. One of the potential jurors said that his knowledge of the appellant would affect his ability to render an impartial verdict, and the trial court immediately excused him. A new potential juror filled the empty seat, and the parties began questioning the potential jurors. During defense counsel's questioning, he asked, "In your personal lives, has anyone ever been involved in some kind of abuse in such a way that you would be more likely to believe an abused victim than Mr. Reeder?" One potential juror raised her hand, said she had been abused, and said that "I don't think I can put it aside." The trial court immediately excused her.

During the rounds of voir dire, as potential jurors moved from sitting in the audience of the courtroom to sitting in the jury box, the trial court continued to question them about whether they knew any of the potential witnesses or knew of any reason why they could not serve. Three additional potential jurors advised the court that they had experiences involving abuse that could impact their decisions in the case, and the trial court immediately excused them. Thereafter, potential jurors Fisher, Raymer, and Murray moved into the jury box. The court stated that "[y]a'll have heard the questions I've asked" and asked if they knew any of the potential witnesses. Murray and Fisher raised their hands. Murray stated that he knew potential witness Stringfield because they used to work for the same company, and Fisher stated that she knew the appellant because he used to work with her husband. Defense counsel asked, "For the new members, is there any reason any of you cannot serve? Carry any prejudice you cannot put aside?" No one answered in the affirmative, and the jury was sworn.

In the appellant's motion for new trial, he claimed that he was denied a fair trial due to juror misconduct. At the hearing on the motion, defense counsel examined Fisher as follows:

> Q      Now, do you recall when I was asking . . . if you know or
>         are related to any of these people, and I went through a
>         long list of names; do you recall that, vaguely?
>
> A      Vaguely, yes, sir.
>
> Q      Okay. And one of the persons I asked about was Jody
>         Jones?
>
> A      (Nods head).
>
> Q      And you didn't hold up your hand or say I know him or
>         anything like that?

A       I didn't hear you say his name. The one time I heard his name during the trial was on a recording when he was talking about him.

Q       So you do know Jody Jones?

A       Yes, sir.

Q       And is it fair to say that Jody Jones and your brother were best friends when they were growing up?

A       I wouldn't say best friends, but they were friends, yes, sir.

Q       And they've worked together?

A       Yes, sir.

Q       Have you gone to church with Jody Jones?

A       A long, long time ago, yes, sir.

Q       And socialized with you?

A       Yes, sir. A long time ago as well.

Q       Basically, you grew up with Jody Jones?

A       Well, he's about nine years older than me. My brother's nine years older than me. I was a little kid when he was around, so . . .

. . . .

Q       Now, at one time, Judge Wallace asked a couple of questions about whether or not anyone had been involved in a similar-type situation or had something like this in their family; do you recall that?

A       Yes, sir.

Q       Have you ever had anything like that happen in your extended family?

A       Somewhat, yes, sir.

Q       And that would be your uncle, Larry Fisher?

A       Yes, sir.

Q       And he was convicted of some sexual offense?

A       Correct.

Q       Concerning your niece?

A       He's my brother-in-law.  He's not my uncle.

Q       Brother-in-law?

A       Yes, sir.

Q       And you didn't disclose that at the time of trial, correct?

A       I didn't.  I guess I didn't think anything about it.  He's been put away a long time so. . .

On cross-examination, the State asked if Fisher knew anything about the facts of this case before trial, and she said no.  The State also asked, "Did you go in with your mind made up whether you were going to acquit or convict Mr. Reeder?"  Fisher answered, "Absolutely not."   On redirect examination, defense counsel asked if Fisher talked about "life experiences" or her brother-in-law during jury deliberations, and she answered no.

The trial court found Fisher to be "honest and trustworthy."  The court noted that it did not specifically remember asking potential jurors if they had "some family history of a sexual incident" and that "I normally would not ask that question during voir dire."  In any event, the court stated that it was satisfied that Fisher "acted on the evidence, and, therefore, it was a proper verdict as far as with her mindset on that issue."

Both the Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution guarantee the right to a trial by an impartial jury.  The

appellant's challenges to Fisher's qualifications fall into the category of <u>propter affectum</u>, "on account of prejudice." <u>See</u> <u>State v. Akins</u>, 867 S.W.2d 350, 355 (Tenn. Crim. App. 1993). A defendant may make an objection based upon bias, prejudice, or impartiality after the jury verdict. <u>Id.</u>

The jury selection process must be guarded carefully to ensure that the defendant has a fair trial and that the verdict is reached by an impartial trier of fact. <u>Id.</u> at 354. The Tennessee Constitution guarantees every defendant "'a trial by a jury free of . . . disqualification on account of some bias or partiality toward one side or the other of the litigation.'" <u>Id.</u> (quoting <u>Toombs v. State</u>, 197 Tenn. 229, 270 S.W.2d 649, 650 (Tenn. 1954)). "Jurors who have prejudged certain issues or who have had life experiences or associations which have swayed them in response to those natural and human instincts common to mankind interfere with the underpinnings of our justice system." <u>Id.</u> (citation omitted).

Voir dire allows for the impaneling of a fair and impartial jury through questions that permit counsel to intelligently exercise challenges. <u>Id.</u> Full knowledge of the facts that might bear upon a juror's qualifications is essential to the intelligent exercise of preemptory and cause challenges. <u>Id.</u> at 355. Jurors, therefore, are obligated to make "full and truthful answers . . . neither falsely stating any fact nor concealing any material matter." <u>Id.</u> (quotations omitted).

The defendant must establish a prima facie case of bias or partiality. <u>Id.</u> "When a juror willfully conceals (or fails to disclose) information on voir dire which reflects on the juror's lack of impartiality, a presumption of prejudice arises." <u>Id.</u> Silence by a juror when asked a question reasonably calculated to produce an answer is tantamount to a negative answer. <u>Id.</u> "Therefore, failure to disclose information in the face of a material question reasonably calculated to produce the answer or false disclosures give rise to a presumption of bias and partiality." <u>Id.</u> at 356 (footnotes omitted). "The test is whether a reasonable, impartial person would have believed the question, as asked, called for juror response under the circumstances." <u>Id.</u> at n.13. The juror's intent is not dispositive of the issue of bias. <u>Id.</u> at n.15.

A presumption of bias arises "when a juror's response to relevant, direct voir dire questioning, whether put to that juror in particular or to the venire in general, does not fully and fairly inform counsel of the matters which reflect on a potential juror's possible bias." <u>Id.</u> at 357. The presumption may be rebutted by an absence of "actual prejudice" or "actual partiality." <u>Id.</u> Actual prejudice has been established when the presumed bias is confirmed by the challenged juror's conduct during jury deliberations giving rise to the possibility that improper extraneous information was provided to the jury. <u>Id.</u>

Our supreme court has recognized that "proper fields of inquiry [into a juror's bias or partiality] include the juror's occupation, habits, acquaintanceships, associations and other facts, including his [or her] experiences, which will indicate his [or her] freedom from bias." Smith v. State, 357 S.W.3d 322, 347 (Tenn. 2011) (first brackets added; internal quotations omitted; citations omitted). "[F]ailure to disclose information in the face of a material question reasonably calculated to produce the answer or false disclosures give rise to a presumption of bias and partiality," and "[w]hile that presumption may be rebutted by an absence of actual prejudice, the court must view the totality of the circumstances, and not merely the juror's self-serving claim of lack of partiality, to determine whether the presumption is overcome." Akins, 867 S.W.2d at 356-57.

Turning to this case, when Fisher moved into the jury box, the trial court asked if she knew any of the parties or potential witnesses, and she revealed that she knew the appellant. However, she did not reveal that she knew Jones. At the motion for new trial hearing, Fisher, who was not sitting in the jury box when the State read its list of witnesses, said that she did not hear Jones's name until the appellant mentioned it in the recording, and the trial court accredited her testimony. Therefore, nothing shows that Fisher willfully failed to disclose that she knew Jones. Although Fisher failed to reveal that she knew Jones when she heard his name mentioned on the recording, we are not convinced that Fisher would have realized that he was a potential witness in the case. Therefore, a presumption of bias was not created with regard to Jones. Moreover, the appellant has produced no evidence to suggest that Fisher's prior knowledge of Jones resulted in prejudice to the appellant. We note that Jones did not testify at trial. Therefore, we conclude that the appellant is not entitled to relief on this issue.

Regarding Fisher's brother-in-law, Fisher also was not in the jury box when defense counsel asked if any of the potential jurors had ever been involved in abuse that would prejudice them against the appellant. However, three other prospective jurors also were not in the jury box at the time of the question yet revealed experiences that they thought would create bias. One potential juror stated that his niece had been molested, another stated that she knew of "a situation" involving her oldest daughter, and the third stated that he knew of an incident involving children where the culprit "more or less beat the rap." Thus, other potential jurors recognized the importance of revealing experiences with abuse, and Fisher's silence regarding a sexual offense committed by her brother-in-law arguably created a presumption of bias. However, the exact offense committed, the circumstances of the offense, the date of the offense, and the victim of the offense were never revealed. Although defense counsel asked Fisher if the offense "involved" her niece, defense counsel was distracted by Fisher's clarifying that Larry Fisher was her brother-in-law, not her uncle, and never had her answer the question. Therefore, we cannot say that Fisher's failure to reveal the information created a presumption of bias in this case.

-10-

## B. Prosecutorial Misconduct

The appellant raises several issues regarding prosecutorial misconduct during the State's case and closing arguments. In order to prevail on a claim of prosecutorial misconduct, the appellant must demonstrate that the prosecution's conduct was so inflammatory or improper that it affected the verdict to his detriment. Harrington v. State, 385 S.W.2d 758, 759 (Tenn. 1965); State v. Gray, 960 S.W.2d 598, 609 (Tenn. Crim. App. 1997). In making this determination, this court is guided by five factors:

> 1. The conduct complained of viewed in context and in light of the facts and circumstances of the case.
>
> 2. The curative measures undertaken by the court and the prosecution.
>
> 3. The intent of the prosecutor in making the improper statement.
>
> 4. The cumulative effect of the improper conduct and any other errors in the record.
>
> 5. The relative strength or weakness of the case.

Judge v. State, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976); see also State v. Buck, 670 S.W.2d 600, 609 (Tenn. 1984).

## 1. Appellant's Statement About Doing Something Bad

The appellant contends that the prosecutor committed misconduct by violating a stipulation with the State not to introduce a statement made by the appellant. Before trial, the appellant filed a motion to suppress any statements he made to the police on March 5 and a motion in limine to prohibit the State "from mentioning a statement that Mr. Reeder made that he had done something bad." At a pretrial hearing on the motions, defense counsel argued that the trial court should suppress the appellant's March 5 statement because the police continued to question him after he unequivocally invoked his right to counsel. The State argued that although the appellant invoked his right to counsel, the police "couldn't shut him up." The trial court denied the appellant's motion to suppress. Defense counsel then argued as follows:

> There was an alleged statement or statement allegedly made by

-11-

Mr. Reeder that I did something bad and I think that's so nebulous. I don't have any idea of what it could be and I think anybody can take a guess and I think that's more in the area of character evidence than proof and I don't think it's relevant to anything because I don't think it's specific enough.

. . . .

I just don't think it's got any relevancy, Your Honor. I don't think it's specific enough. It's not a confession. It could mean anything. I think it would prejudice the jury. I think the prejudicial effect outweighs any relevancy in my opinion.

The State responded that defense counsel was "talking about . . . a handwritten note regarding where he communicates to a friend of his that he's done something bad. . . . It's not an oral statement, it's actually on a piece of paper." In a written order, the trial court ruled that "there will be a Jury out hearing when a piece of paper stating 'He had done something bad' is introduced."

Before trial, a new trial court and a new assistant district attorney general became involved in the case. On the day of trial, defense counsel advised the court that he had talked with the new assistant district attorney general and that the general had agreed not to mention the appellant's statement about doing something bad. The general then advised the court as follows:

Absolutely. And the one specific example that we were referring to is there is a witness that's been subpoenaed, a Mr. Jones, who is a jail bird witness who I don't place any credibility in, but I just got a note that he wants to talk to me during the break. And that's the statement that [defense counsel] is referring to about Mr. Reeder said he did something bad. The State does not plan to put that on as proof.

During Detective Matlock's testimony, the State asked him to play the appellant's February 2009 interview for the jury. Defense counsel renewed his objection "as far as Mr. Reeder had requested legal counsel," and the State requested a jury-out hearing. During the hearing, the prosecutor stated, "I want to make sure we're on the same page. I wasn't here when his motion in limine was argued. . . . I want to make sure that [defense counsel] is not objecting to what Mr. Reeder says himself in this interview." Defense counsel said he was not objecting, and the State played the interview. The State then asked Detective Matlock

-12-

to play the appellant's March interview. During the interview, the appellant told the police that Jones "said I said I did something as bad as murder." Defense counsel objected, and the trial court held another jury-out hearing. In the hearing, defense counsel requested a mistrial

> on the basis that they just put on evidence that was the subject of my motion in limine and was granted by Judge Sexton that they would have a jury out hearing before they put any evidence related to a statement about Jimmie Reeder doing something as bad as murder and they just played it. And I think even though it's his statement, we did have a motion in limine and it was sustained by Judge Sexton.
>
> In fact, Bob Wilson -- General Wilson at the time agreed that we would have a jury out before any evidence was introduced, and we just had it played in front of a jury.

The State argued that "I did have a jury out" and that it clarified from the defense "is this what you were talking about." The trial court agreed with the State and concluded that the appellant had waived the issue. The trial court also ruled that, in any event, the appellant's statement was admissible as a party admission.

The appellant contends that the prosecutor violated the stipulation regarding the evidence. The appellant contends that "[w]hile there may have been some confusion concerning these recording[s], the fact is the State represented that they were not going to use this statement as part of their proof and then the statement is played for the jury." However, during the hearing on the motion in limine, the State made clear that it was referring to a written statement by the appellant. Moreover, the trial court's order granting the appellant's motion provided that a jury-out hearing would be held before the State introduced "a piece of paper." During the jury-out hearing at trial, the State asked if defense counsel was "objecting to what Mr. Reeder says himself in this interview." Defense counsel had several opportunities to clarify that his objection included the appellant's statement in the recorded interview but never did so. Therefore, we agree with the trial court that the appellant has waived the issue. See Tenn. R. App. P. 36(a).

2. Asking Witnesses to Vouch for Victim's Credibility

Next, the appellant contends that the prosecutor committed misconduct by asking Detective Matlock and Hollye Gallion to vouch for the victim's credibility. Specifically, the prosecutor asked the detective, "You don't doubt what [the victim] has to say?" Similarly, the prosecutor asked Gallion, "Based on your evaluation with [the victim] on February the

17th, 2009, did you have any reason to not believe what she was saying?" However, in each instance, defense counsel immediately objected, and the witness never answered the question. Therefore, any error in asking the questions was harmless. See Tenn R. App. P. 36(b).

3. Closing Argument

The appellant contends that the State committed prosecutorial misconduct during its closing arguments. The appellant acknowledges that he did not make contemporaneous objections to most of the prosecutor's remarks, thereby waiving the issue. See Tenn. R. App. P. 36(a) (providing that "[n]othing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error").[3] Nevertheless, he requests that we examine the remarks for plain error. See Tenn. R. App. P. 36(b).

Closing argument is an important tool for parties during a trial; therefore, counsel is generally given wide latitude during closing argument. See State v. Carruthers, 35 S.W.3d 516, 577-78 (Tenn. 2000) (appendix). However, "arguments must be temperate, based upon the evidence introduced at trial, relevant to the issues being tried, and not otherwise improper under the facts or law." State v. Goltz, 111 S.W.3d 1, 5 (Tenn. Crim. App. 2003).

In Goltz, this court outlined "five general areas of prosecutorial misconduct" that can occur during closing argument: (1) intentionally misleading or misstating the evidence; (2) expressing a personal belief or opinion as to the truth or falsity of the evidence or defendant's guilt; (3) making statements calculated to inflame the passions or prejudices of the jury; (4) injecting broader issues than the guilt or innocence of the accused; and (5) intentionally referring to or arguing facts outside the record that are not matters of common public knowledge. Id. at 6.

First, we will address the prosecutor's statement to which the appellant objected. During the State's rebuttal closing argument, the prosecutor said,

> I tell you one other thing before I sit down and shut up. Do you want to know why it's hard to remember all the details? It's just like [the victim] said. Was it one time or was it this many? (Demonstrating). And when you have this many -- this many times that Mr. Reeder -- and you think it's funny. He's been smirking and laughing about it the entire trial. This many times (demonstrating).

---

[3]The appellant also did not include this issue in his motion for new trial. See Tenn. R. App. P. 3(e).

-14-

[Defense Counsel]: Objection, Your Honor.

[The State]: That's why she can't remember all the specifics.

The trial court stated that the jury was to "disregard any comment about Mr. Reeder and not consider it at all." The appellant claims that although the trial court instructed the jury to disregard the comment, "some bells cannot be unrung. This was an intentional ploy by an experience[d] prosecutor to prejudice the jury against the Appellant." The State argues that the appellant cannot demonstrate prejudice because the comment was brief and the trial court gave a curative instruction.

A prosecutor's commenting on a non-testifying defendant's courtroom behavior can constitute reversible error. See United States v. Shuler, 813 F.2d 978, 979-82 (9th Cir. 1987); United States v. Wright, 489 F.2d 1181, 1186 (D.C. 1973). During the appellant's motion for new trial hearing, the trial court stated that the comment "[s]houldn't have probably been said" but held that its instruction to the jury "corrected that issue." We generally presume that a jury has followed the trial court's instructions. See State v. Butler, 880 S.W.2d 395, 399 (Tenn. Crim. App. 1994). Accordingly, we conclude that the appellant is not entitled to relief.

The appellant contends that he is entitled to plain error relief for the prosecutor's continuously trying to invoke sympathy for the victim, vouching for the victim's credibility, expressing his personal opinions and interactions with the victim, making derogatory remarks about the defense presented, and using the appellant's religion to influence the jury. Although he cites to numerous pages in the trial transcript for these remarks, we will only consider the one for which he provided appropriate legal authority pursuant to Tennessee Court of Criminal Appeals Rule 10(b): that the prosecutor stated,

> In the Child Advocacy Center interviews, [the victim] says, it stopped after Mr. Reeder was baptized. Do you remember that?
>
> Listen to the rest of Mr. Reeder's babbling in his interviews, God will save him. God is going to clear his name. That's what he's telling you. He's talking about being baptized. He had just been baptized. And that's what [the victim] is trying to tell you, that it stopped right after he got baptized. It's the small details that corroborate [the victim's] story.

Tennessee Rule of Appellate Procedure 36(b) provides that "[w]hen necessary to do substantial justice, [this] court may consider an error that has affected the substantial rights

of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal." See also Tenn. R. Evid. 103(d). We may only consider an issue as plain error when all five of the following factors are met:

> a) the record must clearly establish what occurred in the trial court; b) a clear and unequivocal rule of law must have been breached; c) a substantial right of the accused must have been adversely affected; d) the accused did not waive the issue for tactical reasons; and e) consideration of the error is "necessary to do substantial justice."

State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994) (footnotes omitted); see also State v. Smith, 24 S.W.3d 274, 283 (Tenn. 2000) (adopting the Adkisson test for determining plain error). Furthermore, the "'"plain error" must be of such a great magnitude that it probably changed the outcome of the trial.'" Adkisson, 899 S.W.2d at 642 (quoting United States v. Kerley, 838 F.2d 932, 937 (7th Cir. 1988)).

"It is settled law in this state that references to biblical passages or religious law during a criminal trial are inappropriate." State v. Berry, 141 S.W.3d 549, 586 (Tenn. 2004). Moreover, as noted by the appellant, "Arguments which rely upon . . . religious . . . prejudices of the jurors introduce elements of irrelevance and irrationality into the trial which cannot be tolerated in a society based upon the equality of all citizens before the law." Goltz, 111 S.W.3d at 7. The appellant claims that the prosecutor was seeking to use the appellant's religion to influence the jury. We disagree. During the appellant's March 2009 interview, he told the police that he had been "staying right with the Lord," that he had been going to church, and that he and his children recently had been baptized. During the victim's March 2009 interview, she stated that the appellant stopped abusing her when he was baptized. Therefore, we conclude that the prosecutor was referring to the evidence presented and that his argument was not improper.

## C. Evidence of Prior Sexual Abuse

Finally, the appellant contends that the trial court erred by granting the State's motion in limine to exclude any evidence of prior sexual abuse of the victim. The State argues that the appellant has waived this issue because he failed to make an offer of proof regarding the evidence he wanted to present and that, in any event, the trial court properly ruled that the evidence was inadmissible. We agree that the evidence was inadmissible.

Before trial, the State filed a motion in limine to prohibit the appellant "from soliciting statements from any witness that introduces any reference to or statement concerning a DCS

-16-

investigation in the year 2007 involving the juvenile victim in the present case. The 2007 investigation is hearsay, irrelevant and entirely outside the scope of the present case." In a hearing on the motion, the State advised the trial court that its motion related to a 2007 investigation of the victim's foster father, James Barnhill. According to the State, DCS began the investigation after someone at a child care center reported that the victim had tried to "French kiss" another child. The State said that during the investigation, Barnhill was "indicated" but that the case was later marked "allegation unfounded, perpetrator unfounded." The victim never alleged that Barnhill sexually abused her, and Barnhill was never charged with a crime. The State said that if defense counsel wanted to question the victim at trial about any prior allegations of sexual abuse, "that's fine, but for [defense counsel] to ask any of the other witnesses who have no involvement in this particular DCS case would be nothing but eliciting hearsay testimony."

Defense counsel argued that according to the DCS report, the victim saw a doctor for itching and redness on her genitals. Defense counsel stated that during the doctor's exam, the victim's great aunt expressed concern that the victim had been sexually abused because "Barnhill, the grandfather, has her undress before going to bed because he is worried she will wet the bed." Defense counsel argued that any prior false accusation of sexual abuse was relevant and that statements made during the doctor's exam were admissible pursuant to Tennessee Rule of Evidence 803(4), the hearsay exception for statements made for the purpose of medical diagnosis and treatment, and 803(25), the hearsay exception for a child's trustworthy statements. The State reported that the victim had been diagnosed with a yeast infection, not sexual abuse, and reiterated that the victim never alleged sexual abuse by Barnhill.

The trial court ruled that the admissibility of the evidence was governed by Rule 412(c), Tennessee Rules of Evidence, and that the appellant had failed to follow the procedural requirements set out in the Rule for admitting such evidence. The trial court also found that the evidence was not admissible under any exceptions to the hearsay rule. The trial court ruled that defense counsel could ask the victim if she had ever lied about prior sexual abuse but that he could not question her about the DCS investigation "unless [the State] opens the door or slightly ajars it."

During cross-examination of the victim, defense counsel attempted to ask if James Barnhill undressed her before putting her to bed, and the State objected. In a jury-out hearing, the trial court reminded defense counsel that he could ask the victim if she had previously alleged sexual abuse by someone other than the appellant but that he could not question her about specific incidents unless she said yes. The trial court also reiterated that the admissibility of the evidence was governed by Rule 412(c) and that, because the appellant failed to follow the procedural requirements of Tennessee Rule of Evidence 412(d), the

evidence was inadmissible.

Tennessee Rule of Evidence 412 addresses the issue of whether evidence of a victim's prior sexual behavior is admissible and the procedure to determine when such information should be allowed into evidence. Rule 412(c)(4)(ii) provides that, regarding evidence of sexual behavior with persons other than the accused, "[e]vidence of specific instances of a victim's sexual behavior is inadmissible unless admitted in accordance with the procedures in subdivision (d) of this rule, and the evidence is . . . [offered] to prove or explain . . . [the victim's] knowledge of sexual matters." Moreover, the Advisory Commission Comments specifically address this provision, stating as follows:

> [Subdivision (c)(4)] will most frequently be used in cases where the victim is a young child who testifies in detail about sexual activity. To disprove any suggestion that the child acquired the detailed information about sexual matters from the encounter with the accused, the defense may want to prove that the child learned the terminology as the result of sexual activity with third parties.

Tenn. R. Evid. 412(c)(4), Advisory Comm'n Cmts.

Initially, we will address the State's claim that the appellant has waived this issue for failing to make an offer of proof. The appellant responds that he was not required to make an offer of proof because Tennessee Rule of Evidence 103(a)(2) provides that "a party need not renew an objection or offer of proof to preserve a claim of error for appeal." However, we believe the appellant has misconstrued the Rule. Rule 103(a)(2), Tennessee Rules of Evidence, provides in full as follows:

> Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected; and . . . [i]n case the ruling is one excluding evidence, the substance of the evidence and the specific evidentiary basis supporting admission were made known to the court by offer or were apparent from the context. Once the court makes a definitive ruling on the record admitting or excluding evidence, either at or before trial, a party need not <u>renew</u> an objection or offer of proof to preserve a claim of error for appeal.

(Emphasis added.) Moreover, the Advisory Commission Comments for the Rule state, "Offers of proof must indicate to the reviewing court what was excluded."

Although the appellant argues to this court that the trial court improperly "excluded any reference to prior DCS investigations, prior medical records concerning an allegation of sexual abuse, and allegation of prior sexual abuse," he failed to include any of the records in the appellate record and failed to make any offers of proof regarding proposed testimony about the evidence. Nevertheless, we will address the issue.

The appellant contends that the evidence denied him of his right to present a defense and that Rule 412 was inapplicable in this case because "prior sexual abuse by a third party is not prior sexual activity of the alleged victim." However, he also contends that the excluded evidence "was critical to the defense to rebut the prosecution's claim that a six year old would not know anything about sexual activities unless the Appellant had committed such acts."[4] The Advisory Commission Comments to subdivision (c)(4) demonstrate that the Rule 412 is applicable here.

The procedural requirements of Tennessee Rule of Evidence 412 specify that "[i]f a person accused of an offense covered by this Rule intends to offer . . . under subdivision (c) specific instances of conduct of the victim," the person must follow certain procedures. Specifically, the person must file a written motion to offer the evidence; serve the motion on all parties, including the victim; and provide a written offer of proof with the motion, describing the proof and the purpose for introducing it. See Tenn. R. Evid. 412(d). As the trial court stated, the appellant failed to satisfy any of the requirements. Therefore, we conclude that the trial court did not err by ruling that the evidence was inadmissible.

### III. Conclusion

Based upon the oral arguments, the record, and the parties' briefs, we affirm the judgments of the trial court.

_____
NORMA McGEE OGLE, JUDGE

---

[4]During closing arguments, the State told the jury, "These are alien concepts to a 6-year-old child. Not only are they alien, but it just goes to show you her credibility because a 6 year old would not know about that kind of stuff. They would not know about that." At the appellant's motion for new trial hearing, defense counsel argued that the State committed prosecutorial misconduct in making the statements when the prosecutor knew that the victim "had shown signs of sexual abuse."