Filed 12/18/15  P. v. Zeledon CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>NELSON ZELEDON,<br><br>    Defendant and Appellant. | H038366<br>(Santa Clara County<br>Super. Ct. No. CC595164) |

Defendant Nelson Zeledon was convicted after his second jury trial of two counts of aggravated sexual assault on a child under 14 (Pen. Code, §§ 261, subd. (a)(1), 269.)[1] In the first trial, defendant's attorney hired a psychologist to evaluate defendant and possibly testify as an expert.  Defendant's attorney turned over an unredacted copy of the psychological report to the district attorney.  The expert was not called to testify at trial; however, defendant did testify, and the prosecutor used his statements to the psychologist during the evaluation against him to his great detriment.  The trial court found that defendant had waived both the psychotherapist/patient and the attorney/client privilege by turning over the unredacted psychological report to the prosecutor.

We reversed the judgment as to two counts of aggravated sexual assault on a child under 14 by rape (§§ 261, subd. (a)(1), 269; counts one and two), and one count of

---

[1] All further unspecified statutory references are to the Penal Code.

aggravated sexual assault on a child under 14 by oral copulation (§§ 269, 288, subd. (a); count three), finding that defendant suffered ineffective assistance of counsel by his attorney's act of turning over the unredacted report and waiving his privileges without his consent.  (*People v. Zeledon* (Jan. 14, 2010, H030760) [nonpub. opn.].)

After remand, defendant was re-tried on counts one through three.  The jury convicted him of counts one and two, and acquitted him of count three.

On appeal, defendant again asserts that he suffered ineffective assistance of counsel.  Defendant argues that during the second trial, his attorney failed to assert the marital communication privilege or raise a lack of personal knowledge objection to the admission of statements his wife made regarding an issue in case.  In addition, defendant argues his counsel was ineffective because he did not request the trial court to admonish a particular juror not to consider defendant's courtroom demeanor except when defendant was testifying.  Defendant also argues that the trial court erred in refusing to disclose juror information, and in sentencing him.

### STATEMENT OF THE FACTS AND CASE

This case involved allegations of rape and sexual assault by defendant on K. Doe, a 13-year-old girl who was best friends with defendant's daughter, S.  Defendant denied all of the allegations.

K.Doe was born in February 1991.  Defendant's daughter, S. was a year younger than K.

Both K. and S. attended the Boys and Girls Club while they were in middle school.  The club was next door to their school.  When S. and K. were going to the Boys and Girls Club, defendant would pick them up and take them home.  After S. stopped going to the club, either K.'s mother, her aunt I., or defendant picked her up from the club.

2

During seventh grade, defendant occasionally picked K. up from the club. On one occasion after he picked her up from the club, defendant took K. to his house and raped her. K. weighed about 90 pounds at the time, and when defendant told her to take off her clothes and forced her to have sex with him, she was scared. K. asked defendant not to do it, but he did not listen to her. K. did not tell anyone about the rape because she did not think anyone would believe her. Defendant was an adult and was considered a good guy by the family.

Defendant picked K. up from the Boys and Girls Club, took her to his house, and raped her on five separate occasions. She did not have a specific memory of each time that defendant took her to his house and raped her. K. remembered one time in January 2005 when she was in the eighth grade. Defendant had taken her to his house to rape her, and everyone at the club was looking for her and could not find her. After raping her, defendant took K. back to the club. That was the last time that defendant raped her.

Defendant also forced K. to put his penis in her mouth. She thought that happened two times. K. tried to push him off, but that did not work. K. remembered that defendant was actually able to put his penis inside her mouth one time.

K. spent the night with S. at defendant's house on one occasion. K. woke up and defendant had his finger in her vagina. S. was sleeping in the bed next to K.

On another occasion, K.'s friend, Samantha spent the night at K.'s house. Defendant and his daughter S. also spent the night at K.'s house. Samantha and K. were the same age. The girls were in K.'s room watching a movie. At some point, Samantha left the room to get a snack from the kitchen. When she came back to K.'s bedroom, Samantha was scared and shaking. She told K. that defendant had tried to kiss her.

3

Samantha told K.'s mother what happened. K.'s mother talked to defendant and defendant told Samantha he was sorry. K.'s mother told defendant to leave the house.[2]

S. was the first person K. told about what defendant had done to her. S. had seen defendant trying to kiss her in the past, so K. told S. everything. On April 12, 2005, when she was 14-years-old, K. told defendant's wife, Sandra, that defendant had raped her.

K. had the courage to tell people about defendant when Samantha spoke up about what happened to her. K. did not want this to happen to other girls. Defendant sent K. an e-mail about Samantha, asking what K.'s mother told her about it.

Sergeant John Robb interviewed K. on April 12, 2005, and K. told him that defendant had raped her. After K.'s interview, Sergeant Robb interviewed defendant on April 12, 2005. Defendant said that he thought K. was an excellent role model for S. Defendant denied that he raped K. He stated that when he was unemployed, he would pick K. up from the Boys and Girls Club and take her back to his mother's house. Defendant said that after he got his job at Advanced Medical Equipment Corporation, he would occasionally pick K. up when he was asked to. Defendant denied ever having taken K. back to his house after picking her up.

In May 2005, S. told Officer Ken Tran that K. told her defendant raped her. S. asked K. if she was lying, and K. told S. that she was telling the truth. S. told K. that she should tell S.'s mother, Sandra about the rape. S. heard K. tell Sandra that defendant raped her.

Mary Ritter, a physician assistant and the clinic coordinator and primary examiner at the center for child protection in the department of pediatrics at Santa Clara Valley Medical Center, examined K. for signs of sexual abuse in April 2005. She testified as an

---

[2] Defendant was convicted in the first trial of committing a lewd act upon a child under the age of 14 (§ 288a), in connection with the incident involving Samantha. (*People v. Zeledon*, *supr a*, H030760 [nonpub. opn.].)

expert in child sexual assault and penetrating sexual trauma. In her examination of K., Ms. Ritter found evidence of a penetrating trauma consistent with sexual assault. She could not tell how long ago the tear had occurred, but believed that it happened at least a couple of weeks, and possibly a couple of years ago.

James Crawford-Jakubiak, the medical director of the center for child protection at Children's Hospital in Oakland, reviewed photographs and videotape of K.'s medical examination by Ms. Ritter. Dr. Crawford-Jakubiak testified as an expert for the defense. Dr. Crawford could not tell from the photographs whether the physical findings were naturally occurring, or evidence of trauma from sexual assault.

Dr. John Sterling, the medical director of the center for child protection for Santa Clara County Medical Center, testified on rebuttal for the prosecution as an expert in the area of child assault examinations and penetrating traumatic events. Dr. Sterling reviewed the records, photographs, and videotape of Ms. Ritter's examination of K. Based on his review, Dr. Sterling opined that K. had physical trauma that had healed by the time of the sexual assault examination.

Defendant testified on his own behalf at trial, and denied that he ever took K. to his house. He said that he never attacked K. in his bedroom or in his living room. Defendant said that he never raped K., and he never forced her to put is penis in her mouth, and he never put his finger in her vagina. Defendant denied ever touching K. in a sexual manner. Defendant admitted that he was convicted of a lewd act upon a child for trying to kiss Samantha that night in K.'s kitchen. Defendant thought the incident with Samantha was a misunderstanding.

Fred McCasland was the area director at the Boys and Girls Club, and knew defendant because S. and K. attended the Boys and Girls Club. When S. and K. attended the club together, defendant would drop off the girls and would sometimes pick them up.

5

Mr. McCasland did not remember if defendant ever picked K. up alone after S. had stopped attending the club.

Douglas Robbins was the owner of Advanced Medical Equipment Corporation, and testified that defendant worked for his company from December 2003 to April 2005. Defendant worked from 8:00 a.m. until 4:30 p.m., and was an excellent employee. Mr. Robbins thought that defendant was truthful and conscientious. Mr. Robbins said that defendant would sometimes leave early to pick his kids up from school. Defendant worked out in the field on most days, and was not in the office.

Dominick Ha, an investigator with the District Attorney's Office, testified that the distance between defendant's job and defendant's house was 23.1 miles. It took approximately 37 minutes to drive the 23.1 miles. The distance between the Boys and Girls Club and defendant's house was 4.8 miles, and took approximately 11 minutes to drive.

Defendant's relatives and friends testified on his behalf. Defendant's mother testified that defendant is a truthful person and that K. is a liar and a manipulator. Defendant's mother-in-law testified that defendant is respectful, honest, and responsible. She considered K. a liar and manipulator. Defendant's sister-in-law testified that defendant is a truthful person, and K. is a liar. Defendant is not the kind of person to sexually assault a child. Leticia Hernandez, a family friend, also testified that defendant is truthful and incapable of sexually assaulting a child.

Defendant's wife, Sandra Zeledon testified that K. never told her that defendant had raped her. K. did tell Sandra that defendant had kissed her. Sandra said that S. never told her that S. saw defendant kiss K. Sandra testified that defendant never picked K. up from the club after S. stopped going.

During the presentation of rebuttal evidence, the prosecutor introduced evidence of a taped interview of Sandra Zeledon by Officer Tran in 2005 that occurred in

6

connection with the investigation of defendant's lewd act upon Samantha. In the interview, Sandra told Officer Tran that she knew that defendant continued to pick K. up from the club after S. stopped attending, because defendant and others had told her that. Sandra was recalled to the stand, and denied memory of making the statement. Portions of the tapes were played for the jury.

The transcripts of the interview included the following:

"OFFICER TRAN: Now, earlier, you—you had told me that you had a concern because he was continuing to pick her up; to take her to Girl Scouts.

"SANDRA ZELEDON: Yes, yes. . . .

"[¶] . . . [¶]

"OFFICER TRAN: Okay. But you were concerned about your husband having continued contact with [K.]—

"SANDRA ZELEDON: Because I felt [S.] was angry you know, because Daddy was pick[ing] her up[,] [K.]—

"[¶] . . . [¶]

"SANDRA ZELEDON: Kissing my husband and everything, you know? And it was a time that [K.]—my husband used to come and pick her up, [K.], to the Boys and Girls Club. My daughter wasn't going anymore, but [K.]'s mom insist [*sic*] for my husband to go and get her all the time.

"[¶] . . . [¶]

"SANDRA ZELEDON: But it's not right for my husband to come and go get your daughter because, you know—

"OFFICER TRAN: 'Cause [S.] had stopped going—

"[¶] . . . [¶]

"SANDRA ZELEDON: So and I knew that because my husband tell me, 'Oh, I went to pick up [K.],' and I didn't say anything."

7

At the end of the second trial, the jury found defendant guilty of two counts of aggravated sexual assault on a child under 14 by rape (§§ 261, subd. (a)(1), 269; counts one and two). The jury acquitted defendant of aggravated sexual assault on a child under 14 by oral copulation (§§ 269, 288, subd. (a); count three). Defendant was sentenced to serve 30 years to life consecutive to eight years in state prison. As to counts four and five, sexual penetration of an unconscious victim (§ 289, subd. (d); count four), and lewd and lascivious act on a child under 14 (§ 288a; count five), of which defendant had been convicted at his first trial, defendant was awarded 546 days of total credit, including 475 actual days and 71 days for local conduct credit. As to counts one and two, defendant was awarded credit for 2056 days of actual days in custody from the date the original sentence was imposed.

Defendant filed a timely notice of appeal.

### DISCUSSION

Defendant asserts that he suffered ineffective assistance of counsel, the trial court erred in denying this request for juror information, and the trial court erred in sentencing him.

#### *Ineffective Assistance of Counsel*

Defendant argues that his counsel was ineffective in three ways: by not objecting to the admission of Sandra's statements to Officer Tran as coming within the marital privilege; by not objecting to the admission of Sandra's statements to Officer Tran based on lack of personal knowledge; and by not requesting that Juror No. 4 be instructed not to consider defendant's courtroom demeanor except when defendant was testifying.

To obtain reversal due to ineffective assistance, a defendant must first show "that defense counsel's performance fell below an objective standard of reasonableness, i.e., that counsel's performance did not meet the standard to be expected of a reasonably competent attorney . . . ." (*People v. Cunningham* (2001) 25 Cal.4th 926, 1003;

8

*Strickland v. Washington* (1984) 466 U.S. 668, 688.) Where the record on direct appeal "does not show the reason for counsel's challenged actions or omissions, the conviction must be affirmed unless there could be no satisfactory explanation." (*People v. Anderson* (2001) 25 Cal.4th 543, 569.) Because the defendant bears this burden, "[a] reviewing court will indulge in a presumption that counsel's performance fell within the wide range of professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy." (*People v. Carter* (2003) 30 Cal.4th 1166, 1211.)

Second, a defendant must show that there is "a reasonable probability that defendant would have obtained a more favorable result absent counsel's shortcomings." (*People v. Cunningham, supra*, 25 Cal.4th at p. 1003.) "A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland v. Washington, supra*, 466 U.S. at p. 694; *People v. Staten* (2000) 24 Cal.4th 434, 450-451.)

### Sandra's Statements

This issue of whether defendant continued to pick K. up alone from the club after S. stopped attending was of particular importance at trial, because K. testified that it was on these occasions that defendant would take her to his house and rape her. Defendant denied having picked K. up after S. stopped going to the club in December 2003, and testified as such.

Following defendant's conviction in the second trial, defense counsel filed a motion for a new trial based in part on the argument that he had been ineffective in his representation of defendant, because he did not assert the marital privilege regarding Sandra's statements, nor did he object that the statements were not based on personal knowledge. Specifically, defendant argued that Sandra's statement that defendant admitted to continuing to pick up K. from the Boys and Girls Club after S. stopped attending the club were "confidential marital communications and therefore privileged under Evidence Code section 980 . . . ." The motion argued further: "Mr. Zeledon did

9

not claim this privilege at the time the evidence was offered in this case, which would, by the terms of section 912, subd. (a), constitute a waiver of the privilege. However, the failure to claim the privilege resulted from oversight on the part of Mr. Zeledon's counsel."

"Furthermore, and particularly in light of the motion in limine brought for the specific purpose of excluding this evidence, it cannot be said that the failure to claim the privilege was a tactical decision on the part of counsel. That being the case, and unlike the situation in *Edwards v. Lamarque* (2007) 475 F.3d 1121, in which the court held that counsel's failure to assert the privilege did constitute a waiver, the failure to assert the privilege in this case constituted ineffective assistance of counsel."

In denying defendant's motion for a new trial, the trial court deemed only one sentence of Sandra's statement to be possibly within the marital privilege. That statement was defendant telling her that he continued to pick K. up alone after S. stopped attending the Boys and Girls Club. However, the court noted that counsel's lack of objection to the admission of that potentially privileged statement did not prejudice defendant, because even if that statement were omitted, the remaining statements from the interview could be considered by the jury and "the jurors would still know that Sandra Zeledon was dishonest in her testimony when she testified my husband never picked up the victim K. from the Boys and Girls Club after S. stopped going to the Boys and Girls Club."

The court also found that Sandra knew that defendant was continuing to pick K. up when S. was not attending the club based on information other than defendant's statements, including K.'s mother's insistence that defendant continue to pick K. up. Sandra expressed her dislike of this situation and that she did not consider it to be appropriate that defendant pick K. up, and her worry that S. would be upset by this.

10

*Marital Privilege*

Defendant argues that his trial counsel was ineffective for failing to assert the marital privilege as to the admission of Sandra's statements to Officer Tran about what defendant had told her.

Evidence Code section 980 provides, in relevant part: "Subject to Section 912 and except as otherwise provided in this article, a spouse . . . has a privilege during the marital relationship and afterwards . . . to prevent another from disclosing, a communication of he claims the privilege and the communication was made in confidence between him and the other spouse while they were husband and wife."

Although Sandra's statements to Officer Tran contained her reference to what defendant told her, there is no evidence in the record on appeal that what defendant told her about picking up K. was, in fact, made in confidence such that the marital privilege would apply. (Evid. Code, § 980). Sandra herself testified at trial that she had no memory of talking to her husband; therefore, she did not provide the necessary foundation that the statement was made in confidence.

Defendant argued in this new trial motion that his counsel was ineffective for failing to object on the ground of marital privilege and for failing to request an Evidence Code section 402 hearing for defendant to offer evidence that the conversation between himself and Sandra about him picking K. up from the club was confidential and was not made in the presence of any third party.

With regard to the claim of failing to object based on marital privilege and failing to request an Evidence Code section 402 hearing, we cannot say that counsel's performance fell below the objective standard of reasonableness under prevailing norms. (*People v. Ledesma* (1987) 43 Cal.3d 171, 216-218.) Although the motion for a new trial stated that defense counsel had no tactical reason for failing to object, these were the arguments of counsel and not evidence. The record before us contains no evidence that

11

the communication between defendant and Sandra was made in confidence, and therefore privileged. (Evid. Code, § 980.) As a result, we cannot conclude that defense counsel was defective for failing to object based on marital privilege.

Moreover, even if defense counsel had been able to establish that the communication was privileged, and had objected to its admission, based on the record before us, we do not find that it is reasonably probable that defendant would have obtained a different result. (*People v. Ledesma, supra,* 43 Cal.3d 171, 216-218.) There was other evidence presented at trial that supports defendant's conviction on counts one and two. In addition to K. testifying that defendant continued to pick her up at the club after S. stopped attending, there was evidence that defendant had the opportunity to do so in both the driving time and distances from the club to defendants' work, and in defendant's work time sheets. Sandra stated that she was upset at K.'s mother for relying on defendant to pick K. up at the club after S. stopped attending. Not only was the jury aware that defendant lacked credibility through his impeachment on cross-examination, but the jury also knew that defendant had been convicted of committing a lewd act on K.'s friend, Samantha, which defendant described as a "misunderstanding."

When considered as whole, there was ample support for defendant's conviction on counts one and two. Even if defendant's statement to Sandra had been excluded based on marital privilege, it is not reasonably probable that defendant's verdict would have been different.

### *Personal Knowledge*

Defendant argues that in addition to failing to assert marital privilege, his counsel was also ineffective for failing to object to the admission of Sandra's statements to Officer Tran based on lack of personal knowledge. (Evid. Code, §702, subd. (a).)

The record demonstrates that Sandra had personal knowledge that defendant was continuing to pick up K. after S. stopped attending the Boy and Girls Club because

12

defendant told her he did. Defendant argues that what defendant told her falls within the marital privilege, however, as discussed above, there is no foundation for the conclusion that defendant's statements to Sandra were made in confidence. Sandra's awareness of defendant's conduct satisfies the personal knowledge requirement.

In addition, the record shows that Sandra had personal knowledge of defendant's actions based on other facts as well as defendant's own statements to her. In her interview with Officer Tran, Sandra said that she told K.'s mother, Lourdes that Lourdes needed to take care of K., and that "it was not right for [defendant] to come and go get [K.] because . . . they're not the same babies anymore." Sandra also said that Lourdes insisted that defendant continue to pick K. up from the club.

In addition, during cross-examination at trial, Sandra answered "yes" to the question of whether she knew that defendant continued to pick K. up from the club after S. stopped going. This answer was based on a number of facts, including that Sandra was aware that defendant continued to pick K. up at Lourdes's request, and that she was upset by this because Lourdes was taking advantage of defendant.

Defendant's attorney was not ineffective for failing to object to Sandra's statements based on lack of foundation. The evidence established that Sandra had personal knowledge through defendant's statements, for which no marital privilege could be established, and through Lourdes's actions.

### Issues with Juror No. 4

In addition to defendant's claims regarding evidentiary objections, defendant also argues his counsel was ineffective in how he handled the issues that arose with Juror No. 4.

Specifically, in this case, Juror No. 4 talked to the bailiff, and a hearing was conducted outside of the presence of the other jurors. During this hearing, Juror No. 4 told the court: "Yeah, I asked if it was usual for the defendant to stare at the witness. It

13

didn't seem right to me." In an effort to determine whether the juror could be fair in evaluating the case, the court asked the juror if he had made his decision about whether defendant was guilty or not. Juror No. 4 said that he would base his decision on the evidence presented and that he had an open mind and would keep an open mind throughout the trial.

After meeting with both counsel, the trial court told Juror No. 4 not to discuss the case with anybody, and not "to form an opinion until the end of the trial." The court also stated that defense counsel "said that based on what the juror said I don't believe that there is any issue."

Defendant asserts that the trial court erred in failing to admonish the juror not to consider the defendant's demeanor during trial, and that his counsel was ineffective for not requesting one. Defendant cites a number of cases dealing with an assessment of the defendant's demeanor during trial. (See *People v. Heishman* (1988) 45 Cal.3d 147, 197, abrogated on other grounds in *People v. Diaz* (2015) 60 Cal.4th 1176; *United States v. Wright* (D.C.Cir. 1973) 489 F.2d 1181, 1186.) However, these cases address a prosecutor's misconduct in commenting on a defendant's demeanor while the defendant is not on the witness stand, and are inapplicable to the present case. Here, there is no allegation that the prosecutor improperly commented about defendant's demeanor during the trial.

Juror No. 4 did notice defendant's demeanor and asked the court about it. However, he also answered a number of questions from the court about whether he could be fair and impartial, whether he had an open mind, and whether he would continue to have an open mind throughout the remainder of the trial. Juror No. 4 answered all of these questions in the affirmative. There was nothing in Juror No. 4's conduct that demonstrated that he could not do his job as a juror, and consider all of the evidence before arriving at a verdict.

14

Defendant asserts that his counsel was ineffective by failing to request that the court admonish the juror that he was not to consider defendant's demeanor except when defendant was testifying. However, such admonition was unnecessary in this case, because Juror No. 4 told the court that he had an open mind, would continue to have an open mind and agreed that he would follow the court's instruction that he could base his decision on only the evidence presented and nothing else. As a result, defendant cannot establish that his counsel was deficient for failing to request an admonition that was not necessary.

### *Motion for Release of Juror Information*

Defendant filed a motion for a new trial and to release juror contact information. The motion was based on the jury foreman's report that the jury was deadlocked nine to three for guilt as to counts one and two, and 10 to two for not guilty on count three. Defendant argued that the final verdict of guilt on counts one and two, and not guilty for count three "suggest the possibility that there was a compromise verdict, with the holdouts for acquittal on counts 1 & 2 trading guilty votes for those counts for not guilty votes by the hold outs on count 3."

A trial court's denial of a defendant's motion for disclosure of juror identifying information is reviewed on appeal under the abuse of discretion standard. (*People v. Jones* (1998) 17 Cal.4th 279, 317.)

The trial court denied defendant's motion for disclosure of juror identifying information, finding that defendant did not make the required showing of good cause for disclosure under Code of Civil Procedure sections 206 and 237. The court noted that "[t]here is no evidence before the court that the jury traded votes. . . . Even if the jurors did trade votes, the defendant cites no authority that jurors trading votes amount[s] to juror misconduct. . . . [] There is also no case that specifically holds that [']compromise['] is juror misconduct."

15

Code of Civil Procedure section 206, subdivision (g) provides that a defendant may file a motion for disclosure of jurors' identifying information as follows: "Pursuant to Section 237, a defendant or defendant's counsel may, following the recording of a jury's verdict in a criminal proceeding, petition the court for access to personal juror identifying information within the court's records necessary for the defendant to communicate with jurors for the purpose of developing a motion for new trial or any other lawful purpose. This information consists of jurors' names, addresses, and telephone numbers. The court shall consider all requests for personal juror identifying information pursuant to Section 237."

Code of Civil Procedure section 237 provides the standards and procedures for a defendant's motion to request disclosure of jurors' identifying information, stating in pertinent part: "(a)(2) Upon the recording of a jury's verdict in a criminal jury proceeding, the court's record of personal juror identifying information of trial jurors ... consisting of names, addresses, and telephone numbers, shall be sealed until further order of the court as provided by this section. [¶] . . . [¶] (b) Any person may petition the court for access to these records. *The petition shall be supported by a declaration that includes facts sufficient to establish good cause* for the release of the juror's personal identifying information. The court shall set the matter for hearing if the petition and supporting declaration establish a prima facie showing of good cause for the release of the personal juror identifying information, but shall not set the matter for hearing if there is a showing on the record of facts that establish a compelling interest against disclosure. . . ." (Italics added.)

Both code sections cited above "maximize juror privacy and safety, while retaining a criminal defendant's ability to contact jurors after the trial if sufficient need is shown." (*Townsel v. Superior Court* (1999) 20 Cal.4th 1084, 1087.)

16

Here, defendant's motion was based on speculation that the jurors committed misconduct in arriving at their verdict. This speculation is evident in the language of the motion itself, which stated: "These verdicts *suggest* the *possibility* that there was a compromise verdict, with holdouts for acquittal on counts 1 & 2 trading votes on those counts for not guilty votes by the hold outs on count 3. [¶] This possibility was also suggested by the reactions of the jurors during the polling of the jury after the verdicts were announced. Defense counsel noted that jurors #8 and #11 looked down when responding to the jury poll and appeared to be unhappy about the verdicts. During the discussion with juror after they were released, the jury foreman confirmed that jurors #8 and #11 were two of the three jurors who had voted not guilty on counts 1 & 2."

Defendant provided no evidence of juror misconduct, because all of the arguments of such misconduct were speculative. Defendant's motion relied on the original deadlock on counts one and two, and the facial expressions of two jurors during jury polling. Despite the fact that defense counsel interviewed some jurors after trial, including the jury foreman, he did not submit a declaration, nor did he submit affidavits from the jurors he interviewed along with his motion. Defendant provided no evidence to demonstrate good cause for disclosure of contact information.

Defendant did not make the required prima facie showing of good cause for disclosure of the jurors' identifying information. (Code Civ. Proc., § 237, subd. (b).) Therefore, the court did not abuse its discretion by denying defendant's motion for disclosure of juror identifying information.

*Sentencing Error*

Defendant argues that the trial court erred in sentencing him following the second trial. Although his first appeal resulted in a reversal of his conviction of counts one

17

through three, defendant claims that after he was convicted in his second trial of counts one and two, his entire sentence, including the time he was currently serving for counts four and five should have been reconsidered. In addition, defendant argues that the abstract of judgment does not properly reflect his credits, and that the court should have awarded him local conduct credits.

### *Resentencing*

Defendant argues that he was entitled to reconsideration of his entire sentence when he was sentenced following the second trial.

Following the conviction on counts one and two, defense counsel requested that the court resentence defendant on the entire case, including counts four and five, for which he was previously convicted and sentenced. The court declined the request, stating: "The defendant is committed to the California Department of Corrections and Rehabilitation for 30 years to life consecutive to eight years. The court reaches this by first putting on the record that the court is not resentencing the defendant on counts 4 and 5 for which he already suffered convictions, but he had been sentenced to eight years on those two counts previously."

Defendant relies on *People v. Hill* (1986) 185 Cal.App.3d 831, for the proposition that "when a case is remanded for resentencing by an appellate court, the trial court is entitled to consider the entire sentencing scheme." (*Id.* at 834.) However, in this case, the matter was not remanded for resentencing. In reversing the judgment as to counts one through three, this court instructed the trial court as follows: "The matter is remanded to the trial court for purposes of retrial of Counts 1 through 3, if the prosecution elects to retry defendant on those charges. If it elects not to do so, when the court is directed to resentence defendant on Counts four and five, and enter a new judgment." (*People v. Zeledon*, *supra*, H030760 [nonpub. opn.].)

Since the prosecution chose to retry defendant on counts one through three, there was no option in this court's instructions on remand for the trial court to resentence defendant on counts four and five. Unlike *Hill*, where the sentence was held invalid by the appellant court, here, the sentence on counts four and five remained intact following remand. This court did not remand the matter for resentencing on counts four and five. Therefore, the trial court did not err in declining defendant's request to resentence him on counts four and five, following the retrial of counts one through three.

### *Abstract of Judgment*

Defendant argues that the "Abstract of Judgment was construed in an unusual manner. The construction creates a substantial likelihood that [defendant] will not received all of the section 29005 and 2933.1 credits which were ordered by the trial court."

When defendant was sentenced following the second trial on May 17, 2012, the court dealt with credits as follows: "The defendant is granted credits. In regard to credits at the time of the original sentence on October 4, 2006, the defendant was given 475 actual says plus 71 days at 2933.1 of the Penal Code time for a total of 546 days. From that time he has accrued 2,066 actual days only. The CDRC will calculate his good time work time conduct credits."

Defendant argues that the confusion arises in the abstract of judgment in the way the credits are noted. Specifically, the abstract of judgment includes Form CR-290, "Abstract of Judgment—Determinate," and Form CR-292, "Abstract of Judgment—Prison Commitment—Indeterminate." Form CR-290 reflects the custody credits on counts four and five as 546 days of total, comprised of 475 actual days and 71 days of local conduct credit, but omits the 2066 days of actual credit for defendant's time in custody after remand up until the imposition of sentence following the second trial. Form CR-292 reflects the custody credits of 2066 days of actual days for the time from remand

19

until sentencing following the second trial, but omits the 546 days of credit for time in local custody prior to imposition of the original sentence.

Defendant asserts that the abstract of judgment does not reflect the trial court's sentence, which was that all credits were to be applied toward the sentence as a whole, not separated as to counts four and five from the original sentence and counts one and two from the second. Defendant asks that the abstract be modified to reflect all of the credits on both the Form-290 and Form-292.

The abstract of judgment must reflect the oral pronouncement of judgment. (*People* v. *Hartsell* (1973) 34 Cal.App.3d 8, 14.) Here the abstract does just that. The court did not resentence defendant on counts four and five that remained intact following the first appeal. In the pronouncement of judgment, the court noted that at time of the original sentence in 2006, the credits were 546 days, and at the time of the sentencing after the second trial the credits were 2066 days. The abstract of judgment's two forms for determinate and indeterminate terms accurately reflect the court's statements, and do not need to be changed.

### Local Work/Conduct Credit

Defendant asserts that the trial court erred when it sentenced him following the second trial, because it failed to award him local conduct credit for the time he spent in custody between the remand from this court, and the resentencing.

The date of remand from this court was April 13, 2010, and the date of sentencing after the second trial was May 17, 2012. This period of time was 766 days. Defendant argues that under section 4019, he is entitled to an additional 155 days of local conduct credit for the time he spent in custody between remand and resentencing.

*People v. Buckhalter* (2001) 26 Cal.4th 20 (*Buckhalter*), is applicable to the present case. In *Buckhalter*, the defendant was convicted of multiple felonies committed on a single occasion. The trial court sentenced the defendant to three consecutive

20

indeterminate life terms in state prison under the "Three Strikes" law (§ 1170.12), and he began serving his sentence. Subsequently, the Court of Appeal remanded the matter on sentencing issues only. At resentencing, the trial court awarded the defendant the custody credits, including jail work and conduct credits, that he had earned up to the time he was originally sentenced but refused to recalculate the credit total. (*Buckhalter, supra*, at p. 22.)

The defendant appealed and the Supreme Court concluded: "When, as here, an appellate remand results in modification of a felony sentence during the term of imprisonment, the trial court must calculate the *actual time* the defendant has already served and credit that time against the 'subsequent sentence.' (§ 2900.1.) On the other hand, a convicted felon once sentenced, committed, and delivered to prison is not restored to presentence status, for purposes of the sentence-credit statutes, by virtue of a limited appellate remand for correction of sentencing errors. Instead, he remains 'imprisoned' (§ 2901) in the custody of the Director [of Corrections] 'until duly released according to law' (*ibid*.), even while temporarily confined away from prison to permit his appearance in the remand proceedings. Thus, he cannot earn good behavior credits under the formula specifically applicable to persons detained in a local facility, or under equivalent circumstances elsewhere, 'prior to the imposition of sentence' for a felony. (§ 4019, subds. (a)(4), (b), (c), (e), (f); . . .) Instead, any credits beyond *actual custody time* may be earned, if at all, only under the so-called worktime system separately applicable to convicted felons serving their sentences in prison. (§§ 2930 et seq., 2933.)" (*Buckhalter, supra*, 26 Cal.4th at p. 23; accord, *People v. Johnson* (2004) 32 Cal.4th 260, 266-267.)

In this case, following his first trial, defendant was sentenced, committed, and delivered to state prison in 2006. This court reversed the judgment as to three counts, but left the remaining conviction as to counts four and five for which defendant was serving a

21

prison commitment intact. Therefore, when defendant was returned to the trial court for possible retrial on counts one and two, he was not restored to presentence status, for purposes of the sentence-credit statutes, because he was currently serving an existing prison term on the other counts at the time. (See, e.g., *Buckhalter, supra*, 26 Cal.4th at p. 23.)

*In re Martinez* (2003) 30 Cal.4th 29 (*Martinez*), and *People v. Donan* (2004) 117 Cal.App.4th 784 (*Donan)*, cited by defendant, do not require a contrary holding. In those cases, the defendants were entitled to additional presentence custody credits because their original convictions on all counts were reversed and they were subsequently convicted a second time. (*Martinez, supra*, at p. 31; *Donan, supra*, at p. 786.) Here, defendant was not placed in presentence status when his case was remanded, because this court did not reverse all of defendant's convictions. Defendant continued to serve the original prison commitment on counts four and five at the time of his second trial and as a result, he remained in the prison custody, and was not entitled to local conduct credit.

## DISPOSITION

The judgment is affirmed.

_____

                          RUSHING, P.J.

WE CONCUR:

_____

           PREMO, J.

_____

           ELIA, J.

23